853 A.2d 887

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOSE
R. PINEIRO, A/K/A PINARO, DAVID PINEIRO AND JOSE
A. PINEIRO, DEFENDANT–APPELLANT.

Argued January 21, 2004—Decided August 2, 2004.

16

*Michele A. Adubato,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Frank Muroski,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice WALLACE delivered the opinion of the Court.

In this search and seizure case, following the denial of his motion to suppress evidence, defendant pled guilty to possession of drugs based on evidence seized after a warrantless arrest. As in *State v. Moore,* also decided today, 181 *N.J.* 40, 853 *A.2d* 903, 2004 *WL* 1713632 (2004), we review whether the State had reason-

able suspicion to make an investigatory stop and whether the State had probable cause to search defendant. The trial court and the Appellate Division both answered that question in the affirmative. We disagree in part. We conclude that although there was a reasonable and articulable suspicion to stop defendant and investigate, the totality of the circumstances failed to support a finding of probable cause to search defendant without a warrant.

## I.

Wildwood Police Officer Elias Aboud was the sole witness at the suppression hearing. On December 8, 2000, around 6:15 p.m., he was on routine patrol in the area of Roberts and Pacific Avenues in Wildwood, New Jersey. Aboud characterized this area as a high drug, high crime area. While in his patrol vehicle Aboud observed defendant Jose R. Pineiro and codefendant Jorge Rodriguez standing on the corner of Roberts and Pacific Avenues. There was a bicycle nearby.

Aboud recognized both individuals. He previously had encountered defendant "while clearing the corners" in that same area, and he had received intelligence reports indicating defendant was a suspected drug dealer. Aboud knew Rodriguez, having arrested him for child support and possibly for possession of a controlled dangerous substance (CDS). He also was aware that Rodriguez was a drug user.

The overhead lights in the area allowed Aboud to observe defendant give Rodriguez a pack of cigarettes. Aboud was aware that a cigarette pack sometimes is used to transport drugs. Neither man was smoking at the time. Immediately after the transfer, the two men noticed Aboud. They looked at him with shock and surprise and turned to leave the area. Defendant walked down Pacific Avenue while Rodriguez mounted the bicycle and pedaled westbound on Roberts Avenue. Aboud called for assistance to detain defendant while he pursued Rodriguez. He overtook Rodriguez and detained him. Aboud informed Rodriguez that he believed he had just purchased drugs. Rodriguez

began to cry and denied any drug involvement. Aboud asked Rodriguez for the cigarette pack, and upon receipt of it, looked inside and found a baggie containing three smaller light blue baggies of suspected heroin.

Concurrently, other Wildwood police officers stopped and arrested defendant. The record does not reveal that any evidence was seized from defendant.

The trial court found there was probable cause to arrest Rodriguez and defendant for their involvement in a drug transaction. The Appellate Division agreed, finding that Aboud's specialized knowledge that cigarette packs are used to conceal drugs, his knowledge of Rodriguez's drug involvement, the officer's prior observation of defendant in that same high crime area, and the men's reaction upon seeing the officer established probable cause. We granted defendant's petition for certification, 177 *N.J.* 489, 828 *A.*2d 917 (2003), and now reverse.

## II.

Warrantless seizures and searches are presumptively invalid as contrary to the United States and the New Jersey Constitutions. *State v. Patino*, 83 *N.J.* 1, 7, 414 *A.*2d 1327, 1330 (1980). Both constitutional standards require that such seizures or searches be conducted pursuant to a warrant issued upon a showing of probable cause. *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. There is a constitutional preference for a judicial determination of whether there is probable cause to issue a warrant. *State v. Demeter*, 124 *N.J.* 374, 381, 590 *A.*2d 1179, 1183 (1991). This preference accounts for the difference in result in a "marginal case [where] a search with a warrant may be sustainable [and] where a search without a warrant would fail." *Ibid.*

When no warrant is sought, the State has the burden to demonstrate that " '[the search] falls within one of the few well-delineated exceptions to the warrant requirement.' " *State v. Maryland*, 167 *N.J.* 471, 482, 771 *A.*2d 1220, 1227 (2001) (altera-

tion in original) (quoting *Schneckloth v. Bustamonte*, 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973)). Thus, we evaluate the evidence presented at the suppression hearing in light of the trial court's findings of fact to determine whether the State met its burden. "[T]he State must demonstrate by a preponderance of the evidence that there was no constitutional violation." *State v. Wilson*, 178 *N.J.* 7, 13, 833 *A.*2d 1087, 1090 (2003).

We recently reviewed the constitutionally permissible forms of police encounters with citizens. *State v. Nishina*, 175 *N.J.* 502, 816 *A.*2d 153 (2003). A "field inquiry" is the least intrusive encounter, and occurs when a police officer approaches an individual and asks "if [the person] is willing to answer some questions." *Id.* at 510, 816 *A.*2d at 158 (citation and internal quotation marks omitted). A field inquiry is permissible so long as the questions "[are] not harassing, overbearing, or accusatory in nature." *Ibid.* "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Maryland, supra*, 167 *N.J.* at 483, 771 *A.*2d at 1227 (quoting *Florida v. Royer*, 460 *U.S.* 491, 497–98, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983)). *Cf. Hiibel v. Sixth Judicial Dist. Court of Nev.*, —— *U.S.* ——, 124 *S.Ct.* 2451, 159 L.Ed.2d 292 (2004) (upholding state "stop and identify" statute requiring detainee to disclose his name to officer under suspicious circumstances).

The next type of encounter, an investigatory stop, sometimes referred to as a *Terry*[1] stop, is valid "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." *Nishina, supra*, 175 *N.J.* at 510–11, 816 *A.*2d at 158 (citation and internal quotation marks omitted). The suspicion need not rise to the "probable cause necessary to justify an arrest." *Id.* at 511, 816 *A.*2d at 158. We have explained:

---

[1] *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

The standards by which the reasonableness of police conduct involving an investigatory stop of a person or an automobile [are evaluated] originate with *Terry v. Ohio* .... In *Terry,* the United States Supreme Court ... stated that the reasonableness of the police conduct in conducting an investigatory stop in light of the Fourth Amendment could be generally assessed by " 'balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " The facts used in that balancing test are to be judged objectively: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" When determining if the officer's actions were reasonable, consideration must be given "to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Neither "inarticulate hunches" nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights. Rather, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."

[*State v. Arthur,* 149 *N.J.* 1, 7–8, 691 *A.2d* 808, 811 (1997) (citations omitted) (second alteration in original).]

The last type of encounter is that occasioned by the probable cause standard. Probable cause is not easily defined. In *Moore, supra,* we stated:

[T]he probable cause standard " 'is a well-grounded suspicion that a crime has been or is being committed.' " [*Nishina, supra,* 175 *N.J.* at 515, 816 *A.2d* at 161] (quoting *State v. Sullivan,* 169 *N.J.* 204, 211, 777 *A.2d* 60, 64 (2001)). "Probable cause exists where the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *Schneider v. Simonini,* 163 *N.J.* 336, 361, 749 *A.2d* 336, 349 (2000) (first and second alterations in original) (citation and internal quotation marks omitted), *cert. denied,* 531 *U.S.* 1146, 121 *S.Ct.* 1083, 148 *L.Ed.2d* 959 (2001). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Maryland v. Pringle,* 540 *U.S.* 366, 371, 124 *S.Ct.* 795, 800, 157 *L.Ed.2d* 769 (2003); *accord State v. Dangerfield,* 171 *N.J.* 446, 456, 795 *A.2d* 250, 255 (2002).

[181 *N.J.* at 45–46, 853 *A.2d* at 906–07 (first and second alterations added).]

## III.

Turning to the case at hand, the State seeks to justify the initial stop of defendant as an investigatory stop. Defendant argues to the contrary.

As noted, there must be a showing of reasonable and articulable suspicion for courts to sanction a brief investigatory

stop. In *State v. Stovall*, 170 *N.J.* 346, 788 *A.2d* 746 (2002), the Court reaffirmed the United States Supreme Court definition of reasonable suspicion as " 'a particularized and objective basis for suspecting the person stopped of criminal activity.' " *Id.* at 356, 788 *A.2d* at 752 (quoting *Ornelas v. United States*, 517 *U.S.* 690, 696, 116 *S.Ct.* 1657, 1661, 134 *L.Ed.2d* 911, 918 (1996) (internal citation omitted)). There must be "some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity." *United States v. Cortez*, 449 *U.S.* 411, 417–18, 101 *S.Ct.* 690, 695, 66 *L.Ed.2d* 621, 629 (1981).

A determination of reasonable suspicion is fact-sensitive. *Nishina, supra,* 175 *N.J.* at 511, 816 *A.2d* at 159. The totality of the circumstances must be considered in evaluating whether an officer had a reasonable suspicion to conduct a brief investigatory stop. *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.2d* 859, 867 (1986). An officer's experience and knowledge are factors courts should consider in applying the totality of the circumstances test. *Ibid.*

## A.

A review of several prior cases is helpful to our determination. In *Arthur, supra,* the police observed a woman in a high drug traffic area get into the defendant's car, remain with the defendant for about five minutes, leave with a brown paper bag under her arm, and look around in a suspicious manner. 149 *N.J.* at 4, 691 *A.2d* at 809. Based on the woman's conduct and their knowledge that paper bags were often used to transport drugs, the police stopped the woman, seized the bag, looked inside, and discovered between 100 and 200 glass vials containing a white residue. *Id.* at 5, 691 *A.2d* at 809. The police stopped the defendant's car, and when he was ordered to exit the car he blurted out that he had "bottles" (slang for cocaine). *Ibid.* The Court held that the stop of the woman was lawful, but that the officers' observations did not justify a search of her bag in the absence of any belief that she was armed or dangerous. *Id.* at 14–

15, 691 *A.*2d at 814. The Court determined that the search of the woman was merely an attempt to look for evidence of drugs. *Id.* at 15, 691 *A.*2d at 814–15. Nevertheless, the Court upheld the investigatory stop of the defendant's car because the totality of the circumstances supported a reasonable and articulable suspicion that the defendant was engaged in illegal drug activity, *id.* at 12, 691 *A.*2d at 813, and his admission that he had "bottles" gave the police probable cause to search his person, *id.* at 16, 691 *A.*2d at 815.

Similarly, in *State v. Citarella,* 154 *N.J.* 272, 275–76, 712 *A.*2d 1096, 1097–98 (1998), the Court concluded there was reasonable suspicion to stop and search the defendant after the police officer observed the defendant riding a bicycle off a bridge walkway. The officer recognized the defendant from previous arrests for drug offenses, knew that he lived in the opposite direction from where he was riding, and after making eye contact with the officer the defendant appeared nervous, increased his speed, and jumped off the bicycle and placed it into the back of a pick-up truck. Based on his knowledge that drug traffickers frequently used bicycles to ride into New York and buy drugs, the officer approached the defendant to inquire about his activities. *Id.* at 276, 712 *A.*2d at 1098. Without responding, the defendant hastily mounted his bicycle and departed. *Ibid.* The officer gave chase and stopped the defendant. *Ibid.* The officer believed the defendant was under the influence of CDS because he was sweating profusely, his eyes were bloodshot, and his pupils were slow to react to light. *Ibid.* The officer placed him under arrest and a subsequent search of the defendant revealed suspected crack cocaine. *Ibid.*

The trial court denied the defendant's motion to suppress, finding articulable suspicion to stop, which rose to probable cause to arrest when the officer's observations reasonably led him to conclude that the defendant was under the influence of drugs. *Id.* at 277, 712 *A.*2d at 1098–99. On appeal, a majority of the Appellate Division panel reversed, *ibid.,* holding that the officer

lacked the requisite level of suspicion needed to support a *Terry* stop, thus the arrest and search were fruits of that illegality, *id.* at 278, 712 *A*.2d at 1099.

This Court reversed, concluding that even though "[the] 'defendant's actions might have some speculative innocent explanation,' " they also were reasonably consistent with illegal activity to give the officer reasonable suspicion to conduct an investigatory stop. *Id.* at 280–81, 712 *A*.2d at 1100 (citation omitted). The Court noted that the defendant's flight from the officer merely added weight to the officer's already existing reasonable and articulable suspicion. *Id.* at 280, 712 *A*.2d at 1100. Thus, the Court held that the stop and the ensuing search were valid. *Id.* at 281, 712 *A*.2d at 1101.

Likewise in *State v. Valentine*, 134 *N.J.* 536, 636 *A*.2d 505 (1994), this Court upheld the trial court's finding of specific and articulable facts of criminal activity. A police officer on patrol in a high crime area around midnight saw the defendant duck behind a tree. *Id.* at 539, 636 *A*.2d at 506. The officer approached the defendant, who began walking towards the officer with his hands in his pocket. *Id.* at 540, 636 *A*.2d at 506. The officer recognized the defendant and was aware that he had a lengthy criminal history. *Ibid.*, 636 *A*.2d at 507. The defendant's responses to the officer's questions, along with his nervousness and failure to make eye contact, made the officer uncomfortable and suggested that the defendant might have a weapon. *Ibid.* The officer conducted a pat-down search, which led to defendant's immediate arrest when a hard large object in his pocket proved to be a locked blade knife after removal. *Ibid.* The trial court denied defendant's motion to suppress and a divided Appellate Division panel reversed. *Id.* at 541, 636 *A*.2d at 507. On review, this Court held that the totality of circumstances (which included the officer's isolation, the late hour, the high crime area, and the defendant's furtive movements and prior criminal history) provided a reasonable basis for the officer to conclude that the defendant might be armed and dangerous, and thus the officer was justified in conducting both the *Terry*

stop and the subsequent pat-down search. *Id.* at 553–54, 636 *A.*2d at 513–14.

## B.

Here, Aboud observed defendant give Rodriguez a pack of cigarettes. Based on his experience, Aboud was aware that drugs sometimes are transported in cigarette packs. While the transfer of the cigarette pack may have been purely innocent, *Citarella* and *Arthur* support the proposition that the police may rely on behavior that is consistent with innocence as well as guilt in finding reasonable and articulable suspicion to conduct an investigatory stop. "The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as 'a reasonable person would find the actions are consistent with guilt.' " *Citarella, supra,* 154 *N.J.* at 279–80, 712 *A.*2d at 1100 (quoting *Arthur, supra,* 149 *N.J.* at 11, 691 *A.*2d at 813).

Aboud was familiar with defendant from having "cleared him off the corners" in the same area. Furthermore, Aboud had received intelligence reports that identified defendant as a suspected drug dealer. Regarding Rodriguez, Aboud was aware that he had been involved with illicit drugs and that Aboud previously had arrested him. Additionally, both defendant and Rodriguez immediately departed the area upon seeing Aboud. Based on his knowledge that drugs were sometimes carried in cigarette packs, that he had not observed either of the men smoking, and his familiarity with both men, Aboud decided to stop Rodriguez and defendant. We are satisfied that, even though standing alone each factor may not have been sufficient, the totality of the circumstances, as viewed by a reasonable officer with Aboud's knowledge and experience, established a reasonable and articulable suspicion of criminal activity, justifying an investigatory stop.

The trial court did not emphasize flight as a factor, nor do we. However, we note the following. Although both men departed the scene on seeing Aboud, there was no evidence that they ran

from the scene or refused to stop when the police directed them to do so. Aboud previously had cleared defendant from the same corner, so the men may have departed in anticipation of Aboud "clearing the corner" again. Today, we reaffirm that flight alone does not create reasonable suspicion for a stop, *Dangerfield, supra,* 171 *N.J.* at 457, 795 *A.*2d at 256, although in combination with other circumstances it may support reasonable and articulable suspicion, *Citarella, supra,* 154 *N.J.* at 281, 712 *A.*2d at 1100–01. Thus, even if we were to consider the departure from the scene by defendant and Rodriguez as flight, that flight would only add "weight to the already existing, reasonable articulable suspicion." *Citarella, supra,* 154 *N.J.* at 281, 712 *A.*2d at 1100–01; *see also State v. Tucker,* 136 *N.J.* 158, 169, 642 *A.*2d 401, 407 (1994).

Our concurring colleague urges that the police should not consider an area's reputation for or history of crime, or even the transfer of a cigarette pack, to aid in the determination of reasonable and articulable suspicion. In support of his view, our concurring colleague references a few decisions from other jurisdictions, but he fails to account for either our jurisprudence, or that of other jurisdictions, that considers the reputation or history of an area and an officer's experience with and knowledge of the suspected transfer of narcotics as relevant factors to determine the validity of a *Terry* stop. *See, e.g., State v. Cooper,* 830 *So.*2d 440, 445 (La.App.2002) (holding that officer's experience, training, and common sense may be considered in determining reasonable inferences for investigatory stop; reputation of area is relevant, articulable fact on which officer can rely in determination of reasonable suspicion for investigatory stop); *State v. Freeman,* 64 *Ohio St.*2d 291, 414 *N.E.*2d 1044, 1046–47 (1980) (recognizing relevancy of factors such as area's high crime reputation, officer's awareness of recent criminal activity in area, and officer's training and experience in *Terry* stop analysis); *Commonwealth v. E.M.,* 558 *Pa.* 16, 735 *A.*2d 654, 659 (1999) (upholding *Terry* stop where articulable factors included high-crime area where officer had made many drug arrests, officer saw defendant holding baggie and motioning to others who made exchange of items on officer's approach, and

where defendant "began walking away, quickening his pace into a run when the officer ordered him to stop"); *State v. Allen*, 226 *Wis.*2d 66, 593 *N.W.*2d 504, 508 (Ct.App.), *review denied*, 228 *Wis.*2d 168, 599 *N.W.*2d 409 (1999) (observing that officers' training and experience and area's reputation are factors in totality of the circumstances equation, thus relevant to determination of reasonable suspicion supporting *Terry* stop).

Even so, the concurrence recognizes that our decision follows current precedent, although he cautions against the erosion of our Fourth Amendment protections. In our view, we do no more than follow the admonition of Justice Garibaldi when she expressed the Court's approach to the evaluation of the lawfulness of a given seizure:

> We recognize, as did the Supreme Court in *Terry* and its progeny, the narrow line that must be drawn to protect a citizen's privacy and freedom of movement and yet allow proper law-enforcement activities. We have always favored strong safeguards against governmental interference with a citizen's rights of privacy and freedom. Common sense and good judgment nevertheless require that police officers be allowed to engage in some investigative street encounters without probable cause. Such encounters are justified only if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur. No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity. Such a determination can be made only through a sensitive appraisal of the circumstances in each case. In each case, the reasons for such particularized suspicion will be given careful scrutiny by the Court. A seizure cannot—we emphasize cannot—be justified merely by a police officer's subjective hunch.

[*Davis, supra*, 104 *N.J.* at 504–05, 517 *A.*2d at 867.]

## IV.

■ We next consider whether the facts supported probable cause to seize and search Rodriguez. Both courts below found probable cause to seize the cigarette pack from Rodriguez and to arrest him. The State contends that once drugs were discovered on Rodriguez, there was probable cause to arrest both him and

defendant for suspected drug activity. Thus, we must consider whether the cigarette pack was lawfully seized from Rodriguez.

As we noted above, warrantless searches are presumed invalid. *State v. Cooke*, 163 *N.J.* 657, 664, 751 *A.*2d 92, 95–96 (2000). Unless the warrantless search comes within one of the prescribed exceptions, the search is not permissible. *Ibid.* Similar to its position in *Moore*, the State argues that based on the information available to Aboud, there was probable cause to arrest Rodriguez for possession of drugs.

Today in *Moore* we found probable cause based on the law enforcement officers' observations in a high crime area, which included observing the defendant and a companion walk away from a group of people to the back of a vacant lot, and hand a third man currency in exchange for small unknown objects believed to be drugs. *Moore, supra,* 181 *N.J.* at 46–47, 853 *A.*2d at 907. Here, unlike in *Moore*, there was no observation of currency or anything else exchanged, rather, there was merely a transfer of a cigarette pack under circumstances that had both innocent and suspected criminal connotations. Moreover, there was no proof of "regularized police experience that objects such as [hard cigarette packs] are the probable containers of drugs." *Demeter, supra,* 124 *N.J.* at 385–86, 590 *A.*2d at 1185. The sum of the evidence was merely the officer's prior general narcotics training and experience, and his conclusory testimony that he knew that cigarette packs are used to transport drugs because he had seen that type of activity before. The evidence did not even include the number of times the officer had encountered the use of cigarette packs to exchange drugs or what percentage of observed cigarette packs held drugs.

Although we recognize that this is a close case, in our view the totality of the circumstances here fall short of probable cause.[2]

---

[2] The State does not seek to justify the search under the consent exception, recognizing that Aboud did not inform Rodriguez of his right to refuse consent. *See State v. Johnson,* 120 *N.J.* 263, 288, 576 *A.*2d 834, 847–48 (1990).

The activity observed by Aboud was the passing of a cigarette pack in a high crime area between a known felon and a suspected drug dealer. Aboud apprehended Rodriguez and accused him of having been involved in a drug transaction. After Rodriguez began to cry and denied he had any drugs, Aboud asked if he would voluntarily surrender the cigarette pack and Rodriguez did so. We conclude that the observations by Aboud raised a reasonable and articulable suspicion that criminal activity was occurring, but more is required to support a fair probability that contraband or evidence of a crime would be found in the cigarette pack. After all, the passing of the cigarette pack just as easily could have been nothing more than the transfer of a cigarette pack between two adults. Although nervousness and crying by Rodriguez may have raised the officer's suspicions, we do not find that those factors, even when considered with the other circumstances, reached the level of the elusive concept of probable cause.

Moreover, we need not determine whether a pat-down search would have been reasonable under those circumstances. Aboud never testified that he thought either man might be armed or that he needed to conduct a protective pat-down search. Unlike in *Valentine, supra,* where the officer was aware that the defendant's criminal history included armed robberies and weapons offenses, 134 *N.J.* at 540, 636 *A.*2d at 506–07, there is no evidence of a similar criminal history in this case to justify a protective search.

In summary, we hold that under a totality of the circumstances analysis, the State failed to meet its burden to show probable cause to seize the cigarette pack and arrest the individuals. Consequently, it was error to deny defendant's motion to suppress the evidence.

### V.

The judgment of the Appellate Division is reversed.

Justice ALBIN, concurring.

The mere passing of a cigarette pack between two individuals is an unremarkable occurrence that does not suggest criminal activi-

ty, whether in a high crime area or any other locale. Such ordinary behavior does not lose its innocent character, in my estimation, even if engaged in by a paroled drug offender. For that reason, I cannot agree with my colleagues that the passing of a cigarette pack from one person to another without the exchange of money in a high crime area by people with suspected drug backgrounds gave the police officers a reasonable and articulable suspicion to stop and detain the individuals.

The handing of a cigarette pack from one person to another at a Starbucks in Westfield or outside the Bridgewater Commons Mall would not attract anyone's attention or give a police officer cause for a second thought because such conduct, standing alone, does not suggest that criminal activity is afoot. Such innocuous conduct is not transformed into a criminal enterprise, justifying a *Terry*-type detention and questioning, merely because it occurs in a police-designated high crime area. The police officer's possession of vague "intelligence reports"—of unknown reliability—"indicating defendant was a suspected drug dealer" and his recollection that he "possibly" arrested the other individual for a drug offense should not alter the calculus.

There are tens of thousands of previous drug offenders in this state who are on parole, probation, or who have completed the terms of their sentences. Many of those people live in communities that are designated high crime areas. In my opinion, the Court's holding goes too far and subjects those individuals to a *Terry* stop whenever they hand a cigarette pack to another person.

Although the detective stated at the suppression motion that cigarette packs are sometimes used to conceal drug transactions, there was no testimony concerning the percentage of times a packet of cigarettes is used for such illicit purposes. In *State v. Demeter,* 124 *N.J.* 374, 378, 590 *A.2d* 1179, 1181 (1991), the police stopped a van because of a defective license-plate light. While standing outside the vehicle, the officer noticed a black, cylindrical shaped 35–millimeter film container lying on the front console.

*Ibid.* The officer directed the defendant to hand him the container and inside the container he found a small amount of marijuana. *Ibid.* At a suppression hearing, the arresting officer testified that "in his seven years of experience as a police officer he had investigated at least forty narcotics incidents with 'at least half of them' involving the use of 35–millimeter film containers to hold drugs." *Id.* at 379, 590 *A.*2d at 1182. The stop in that case "did not occur in a high-crime area nor did the police have any tips regarding suspected drug activity by defendant." *Id.* at 379, 590 *A.*2d at 1182. Although we took into account "the specialized experience and work-a-day knowledge of [the] police officer[ ]," we did not find that the seizure met an objective standard of reasonableness. *Id.* at 384, 385, 590 *A.*2d at 1184, 1185 (internal quotation marks and citation omitted). On that occasion, we stated,

> [h]ad there been proof here ... of regularized police experience that objects such as the film canister are the probable containers of drugs, we would have a different case. But here the evidence was the experience of only one officer and even that evidence supplied no information about what percentage of observed containers held drugs.
>
> [*Id.* at 385–86, 590 *A.*2d at 1185.]

The cigarette pack in this case was as "intrinsically innocent" as the film container in *Demeter. See id.* at 382, 590 *A.*2d at 1183.

The words "high crime area" should not be invoked talismanically by police officers to justify a *Terry* stop that would not pass constitutional muster in any other location. *See State v. Carter,* 69 *Ohio St.*3d 57, 630 *N.E.*2d 355, 362 (1994) (finding that high crime area alone was not sufficient to warrant investigative stop, and noting that "[t]o hold otherwise would result in the wholesale loss of personal liberty of those with the misfortune of living in high crime areas"); *Ransome v. State,* 373 *Md.* 99, 816 *A.*2d 901, 908 (2003) (stating that factors such as person's presence in high crime area, bulging pocket, and nervous behavior when suddenly approached by plain clothes officers were insufficient basis for *Terry* stop and frisk, otherwise "there would, indeed, be little Fourth Amendment protection left for those men who live or have occasion to visit high-crime areas"); *see also Brown v. Texas,* 443 *U.S.* 47, 52, 99 *S.Ct.* 2637, 2641, 61 *L.Ed.*2d 357, 362–63 (1979) (holding

presence of appellant in "neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"); Margaret Raymond, *Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion*, 60 *Ohio St. L.J.* 99, 143 (1999) (arguing that "the character of the neighborhood for criminality should be considered only where the behavior that is relied upon to establish reasonable suspicion is behavior not commonly observed among law-abiding persons at the time and place observed").

Whether they have drug backgrounds or not, those who live in high crime areas—a geographical designation that may include a whole neighborhood in an urban area—should not be subject to a lesser expectation of privacy under the State and Federal Constitutions. This is not a case in which the police over a period of time observed singularly suspicious activity, such as an individual handing out a number of cigarette packs to others or accepting money for individual cigarettes or packs of cigarettes. In this case, a police officer merely happened onto a scene in which he made the mundane observation of one individual passing a pack of cigarettes to another. That alone, regardless of the backgrounds of the individuals involved, did not warrant a stop and detention. Vigorous enforcement of the law through a heightened police presence in a high crime area does not require the sacrifice of constitutional protections under the Fourth Amendment and Article 1, Paragraph 7.

The analysis of the majority has not departed from, but merely followed, a set of precedents on the boundary line of our Fourth Amendment jurisprudence. *See, e.g., State v. Citarella*, 154 *N.J.* 272, 280–81, 712 *A.*2d at 1100–01 (1998) (upholding investigatory stop when police officer observed defendant riding bicycle across George Washington Bridge into Fort Lee and, on encountering officer, defendant appeared nervous, increased speed, jumped off bicycle, and placed it in truck); *State v. Arthur*, 149 *N.J.* 1, 10–12, 691 *A.*2d 808, 812–13 (1997) (upholding stop and search of defen-

dant's car when police observed woman enter car parked in area of high narcotics activity, and leave shortly thereafter carrying paper bag and acting "furtively").[1]

In the war against drugs, the justification of one questionable search as the basis for the next questionable search, and the next one, is slowly leading to the erosion of our Fourth Amendment protections. This process occurs almost imperceptibly in much the same way that light fades into dusk and dusk into darkness. It is in this twilight period when changes are barely discernable that we must be most vigilant to guard against the unintended surrender of our valued rights. I am concerned that the incremental extension of precedents on the outer perimeter of our Fourth Amendment jurisprudence will sanction unreasonable searches.

I would not extend *Arthur* and *Citarella* to permit a finding of a reasonable and articulable suspicion of criminal activity on the basis of the seemingly innocent passing of a cigarette pack from one individual to another without any exchange of money—even if the cigarette pack passes between individuals with suspected drug backgrounds in a high crime area. I concur with the majority that the actual seizure of the cigarette pack was not supported by probable cause and, therefore, I join the judgment of the Court.

---

[1] The majority also cites *State v. Valentine*, 134 *N.J.* 536, 636 *A.*2d 505 (1994), in support of its holding today. In *Valentine*, the Court upheld a police officer's pat down search of a defendant known to the officer to have an extensive criminal history. *Id.* at 539, 636 *A.*2d at 506. The officer was patrolling a high crime area when he observed the defendant duck behind a tree, then walk towards the officer with his hands in his pockets. *Id.* at 539–40, 636 *A.*2d at 506. When questioned by the officer, the defendant answered evasively, appeared nervous, and would not make eye contact with the officer. *Id.* at 540, 636 *A.*2d at 507. I suggest that *Valentine*, in which the Court held that the police officer had reasonably concluded that the defendant might be armed and dangerous, is easily distinguished from *Arthur*; *Citarella*, and the case now before us. *See id.* at 553–54, 636 *A.*2d at 513–14. Those three are all drug cases, in which the police had no reason to suspect that the defendants were armed and dangerous.

Justice LaVECCHIA, concurring in part and dissenting in part.

Defendant, Jose Pineiro, challenges the constitutionality of the stop and search of his co-defendant, Jorge Rodriguez, which yielded a quantity of heroin that supported defendant's conviction for third-degree conspiracy to possess a controlled dangerous substance contrary to *N.J.S.A.* 2C:5–2. Under the totality of the circumstances, I would hold that officer Elias Aboud's investigatory stop of Rodriguez, and consequent search of the cigarette pack handed to him by Rodriguez, were lawful, and would affirm the Appellate Division.

Article I, paragraph 7, of the New Jersey Constitution, like the Fourth Amendment of the United States Constitution, "protect[s] citizens against unreasonable police searches and seizures by requiring warrants upon probable cause unless the search falls within one of the few well-delineated exceptions to the warrant requirement." *State v. Johnson,* 171 *N.J.* 192, 205, 793 *A.*2d 619, 626 (2002) (internal quotation marks omitted). An investigatory stop qualifies as one such exception. It allows an officer "to make such a stop if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." *State v. Nishina,* 175 *N.J.* 502, 510–11, 816 *A.*2d 153, 158 (2003) (internal quotation marks omitted). As we stated in *State v. Stovall,* 170 *N.J.* 346, 357, 788 *A.*2d 746, 752 (2002), "[i]n justifying an investigatory detention based on reasonable suspicion, a police officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." Reasonable suspicion must be based on "the totality of circumstances." *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859, 867 (1986). Therefore, "[f]acts that seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate." *Nishina, supra,* 175 *N.J.* at 511, 816 *A.*2d at 159. The stop of Rodriguez met that standard. On that, the majority and I agree.

However, Officer Aboud not only stopped Rodriguez, he also conducted a warrantless search of the cigarette pack that Rodri-

guez handed over to him. A warrantless search is valid "when an officer has probable cause to believe that a crime has been or is about to be committed and the officer is faced with exigent circumstances." *Id.* at 515, 816 *A.*2d at 161. We have found probable cause to exist when an officer has "a well-grounded suspicion that a crime has been or is being committed," *ibid.,* and that "requires nothing more than a practical, common-sense decision whether, given all the circumstances, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Johnson, supra,* 171 *N.J.* at 214, 793 *A.*2d at 633. Thus, as with reasonable suspicion, probable cause must be assessed in light of the "totality of the circumstances." *Id.* at 215, 793 *A.*2d at 633. "Probable cause merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief ... that certain items may be contraband ... or useful as evidence of a crime." *Ibid.*

Like reasonable suspicion and probable cause, the concept of exigent circumstances "is incapable of precise definition," *Nishina, supra,* 175 *N.J.* at 516, 816 *A.*2d at 162, and "demands a fact-sensitive, objective analysis." *Id.* at 517, 816 *A.*2d at 162. For example, in *Nishina* we found exigent circumstances could exist where "police suspected that a drug transaction had occurred," and " 'the officers ... had no time in which to procure a warrant to search defendant because the evidence very well could have been consumed, hidden or sold by the time such a warrant issued.' " *Ibid.* (quoting *State v. Guerrero,* 232 *N.J.Super.* 507, 512, 557 *A.*2d 713, 715 (App.Div.1989)).

In my view, the totality of the circumstances in this case supports a finding of reasonable suspicion, probable cause, and exigency, thereby justifying Officer Aboud's actions. From the suppression hearing, we know that Officer Aboud had extensive on-the-job training in narcotics: as a thirteen-year veteran of the Wildwood Police Department in which capacity he had conducted over three hundred drug investigations leading to arrests and convictions, and as a member for one year of the Cape May

County Narcotics Task force. In addition, Officer Aboud had attended narcotics and advanced narcotics classes at Camden County Community College. Officer Aboud previously had encountered defendant "clearing corners" at the same intersection, that of Roberts and Pacific Avenues. Also, Officer Aboud previously had arrested Rodriguez for a drug offense and considered Rodriguez to be a drug addict. Officer Aboud knew of intelligence reports identifying defendant as a drug dealer.

With that background knowledge, Officer Aboud was on patrol near the intersection of Roberts and Pacific Avenues in the early evening of December 8, 2000. That particular intersection is notorious for drug trafficking, a fact so well known that defense counsel suggested that the trial court "could probably almost take judicial notice of that." At approximately 6:16 p.m., Officer Aboud observed Rodriguez hand a hard pack of cigarettes to defendant at the northwest corner of the intersection. Officer Aboud knew that hard cigarette packs often were used in drug transactions, a fact acknowledged by defense counsel during summation at the suppression hearing and recognized as well by the motion court (unlike a soft cigarette pack, which has an open top that makes interior inspection possible, the contents of a hard pack cannot be viewed by onlookers). Officer Aboud observed that neither defendant nor Rodriguez was smoking or visibly possessed a lighter or matches, and Rodriguez did not attempt to smoke a cigarette after receiving the cigarette pack from defendant.

At the time Officer Aboud first saw defendant and Rodriguez that night, he was approximately fifteen feet from them in his patrol car. Officer Aboud's vehicle crept slowly toward defendant and Rodriguez. When the officer was as few as eight to ten feet from them, Aboud witnessed defendant hand the hard cigarette pack to Rodriguez. Almost simultaneously, defendant and Rodriguez both looked up and, seeing Officer Aboud in his vehicle almost alongside them, exhibited shock and surprise despite, as defendant contends, merely having exchanged a pack of cigarettes.

Both defendant and Rodriguez immediately broke off their exchange and departed in different directions.

When stopped by Officer Aboud, Rodriguez appeared very nervous and began to cry, which the motion court took to be "a fairly extreme response." Officer Aboud inquired about what seemed to be a transaction between Rodriguez and defendant, to which Rodriguez replied, "I don't have any drugs." Officer Aboud then asked to see Rodriguez's cigarette pack, which Rodriguez handed over without incident, stating "I have no drugs on me. I have no problem. You can search me." Inside the cigarette pack, Officer Aboud found three light blue colored wax paper baggies that contained heroin. Defendant was apprehended minutes later.

The motion court found Officer Aboud to be a credible witness. On review of the court's findings during the suppression hearing, we give deference to the trial court's knowledge and experience in respect of locality of the purported crime, *Johnson, supra,* 171 *N.J.* at 219, 793 *A.*2d at 635–36. In this case, those findings include that the corner of Roberts and Pacific Avenues is a known drug-trafficking area, and that hard pack cigarette boxes are known to be used in narcotics street trafficking. Further, reviewing courts are exhorted to give more than "mere grudging recognition," *Davis, supra,* 104 *N.J.* at 503, 517 *A.*2d at 866, to an officer's training and experience, which Officer Aboud possesses in abundance. I thus find persuasive the motion court's findings and conclusion at the suppression hearing:

The initial stop was obviously valid. When two known drug users are in a high drug area and are witnessed engaging in what appears to be a drug transaction, there is ample basis for not just an investigatory stop, but ample basis for a seizure. There was probable cause, at that juncture I find, to arrest Rodriguez as well as [defendant] for their involvement in what appeared to be a drug transaction. There [w]as obvious exigency because of the nature of the contraband in question, it's small size, and the ease with which it could have been discarded or hidden or consumed by the defendant, for that matter.

There are, as we all know, exceptional circumstances, in which on balancing the need for effective law enforcement against the right of privacy, a warrant may be dispensed with. I find that this is one such situation. Of[ficer] Aboud had a reasonable belief, far more than mere suspicion, that a crime had been committed

and that he had just witnessed it. And that suspicion was not just the setting, but the defendants' own conduct and Mr. Rodriguez's statements.

The motion court's holding, affirmed by the Appellate Division, fully comports with our prior jurisprudence that applies a totality of the circumstances analysis for probable cause. *See, e.g., Johnson, supra,* 171 *N.J.* at 220, 793 *A.*2d at 636 (holding that probable cause existed under totality of circumstances because of facts known to police officer and reasonable inferences drawn thereof); *State v. Toth,* 321 *N.J.Super.* 609, 613–14, 729 *A.*2d 1069, 1071 (App.Div.1999) (finding probable cause to seize suspected package of drugs from defendant's shorts where totality of circumstances included "defendant's evident nervousness; his query to the trooper, 'Can't you just let us go?'; his desire to shield the bulge from inspection; and the sheer size and mass of the bulge itself"); *State v. Jones,* 287 *N.J.Super.* 478, 484, 497, 671 *A.*2d 586, 588–89, 595 (App.Div.1996) (holding that totality of circumstances provided sufficient probable cause for police officer to search canister in defendant's car when defendant made furtive gestures and was unable to produce a driver's license; his eyes were bloodshot and dilated; and he was nervous).

Indeed, as Justice Zazzali explained about a totality of the circumstances analysis, albeit in the context of finding reasonable suspicion:

We take the facts as we find them; they cannot be neatly packaged. One can either patch together those factors into a quilt of reasonable suspicion or parse those same factors to unravel the evidence of guilt. The better view, based on this evidence and the template of common sense, is that [the detective in this case] had more than a "hunch." He had the responsibility not to turn a blind eye to what he heard and saw; he had the concomitant right to act as he did. Based on the totality of the circumstances, we are satisfied that [the detective] had reasonable suspicion to detain defendant.

[*Stovall, supra,* 170 *N.J.* at 370–371, 788 *A.*2d at 760–61.]

Based on the totality of the circumstances here, I am satisfied that Officer Aboud had reasonable suspicion to stop Rodriguez, and that probable cause and exigent circumstances justified Officer Aboud's search of the cigarette pack handed to him by Rodriguez. Indeed, the trial court's finding of exigent circumstances was a

prescient recitation of the rationale for our finding that exigent circumstances existed in *Nishina, supra,* 175 *N.J.* at 517, 816 *A.*2d at 162–63.

In my view, only by taking an unintegrated, rather than holistic, view of the facts presented here can the majority conclude that Officer Aboud's actions were constitutionally infirm. Officer Aboud had considerable experience in narcotics investigations; he was on patrol in a high drug-trafficking area; he had previously encountered defendant "clearing corners" in that location and identified defendant as a drug dealer; defendant received a known container for illegal narcotics from Rodriquez; when Aboud approached, defendant appeared shocked and surprised; defendant and his cohort immediately fled; and when later confronted by Aboud, defendant began to cry, and seemed nervous and defensive in his responses. I simply cannot agree that the totality of those circumstances do not give rise to probable cause sufficient to justify the search. The majority notes Aboud's failure to witness an exchange of currency, finding that omission as significant in forming its conclusion that these circumstances do not amount to probable cause that a crime was being committed. That reasoning, however, divorces the "omitted fact" from context. The alleged "failure" to witness an exchange of currency for drugs should be recognized for what it was: an interrupted drug transaction caused by the participants' realization that Aboud was virtually next to them in his patrol car. And, Aboud, as a trained professional, had every reason to perceive what he was observing as such, and to act thereupon by following the evidence of the crime he had just witnessed. Given the circumstances, Officer Aboud reasonably concluded that he had probable cause to stop and search Rodriguez. The lower courts credited his practical and common-sense decision to pursue that evidence, and so would I. I believe that, by holding as it does, the Court creates a constitutionally unnecessary barrier to the ability of law enforcement authorities to effectuate searches and seizures in respect of consummated, albeit also ongoing, criminal activities. I therefore respectfully dissent.

Justice ZAZZALI joins in this opinion.

*For reversal*—Chief Justice PORITZ, Justices VERNIERO, ALBIN and WALLACE—4.

*Concurring in part; dissenting in part*—Justices LaVECCHIA and ZAZZALI—2.