**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2905-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAHJAN A. ROBINSON,
a/k/a RAHJAN PEARSON,
RAQUAN MOORE,
and TYSHAN MAINE,

     Defendant-Appellant.

_____

Argued April 9, 2025 – Decided July 22, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 23-05-0289.

Rachel A. Neckes, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Rachel A. Neckes, of counsel and on the briefs).

Brian Uzdavinis, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Rahjan A. Robinson appeals from the trial court's May 14, 2024 order memorializing its October 2023 denial of his motion to suppress a gun and drugs found on his person during a police stop. Because the police commands to defendant to stop were supported by reasonable, articulable suspicion, justifying the warrantless search and seizure of evidence incident to his arrest, we affirm.

## I.

On May 10, 2023, an indictment charged defendant, together with co-defendants, Asher Conn and Branden Little, with one count of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); one count of second-degree possession of a firearm while committing a controlled dangerous substance (CDS) offense, N.J.S.A. 2C:39-4.1(a); two counts of third-degree possession of CDS (cocaine, heroin), N.J.S.A. 2C:35-10(a)(1); two counts of third-degree possession of CDS (cocaine, heroin) with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3); two counts of second-degree possession of CDS with intent to distribute within 500 feet of certain public property, N.J.S.A. 2C:35-7.1(a); and one count of fourth-degree resisting arrest, N.J.S.A. 2C:29-

2(a)(2). A separate indictment charged defendant with one count of second-degree certain persons not to have a firearm or ammunition, N.J.S.A. 2C:39-7(b)(1).

Defendant filed a motion to suppress, challenging the constitutionality of the stop and search that led to his arrest and the subsequent seizure of the firearm and CDS as a result. After a multi-day hearing, the court rendered an oral decision on October 20, 2023, and denied defendant's motion. On March 4, 2024, defendant pled guilty to the certain persons to possess a weapon offense under the second indictment, and the court sentenced defendant to ten years' imprisonment with five years' parole ineligibility.

We derive the following facts from the motion record.

A.    The Motion Record

Elizabeth Police Officer Israel Morales, assigned to the Narcotics Division, with years of experience and training in narcotics investigations, testified that on February 10, 2023, at around 3:00 p.m., he was on duty "conducting surveillance" of a specific area of Elizabeth, assisted by drone surveillance. The drones, called Unmanned Aerial Systems, assisted the "land surveillance operation" involving approximately sixteen police officers.

The officer described his familiarity with a high degree of criminality in

the area "due to prior police investigations and other calls for service[,] . . . constant surveillance[,] . . . and also information received from confidential informants and citizen informants." He described the area as "flooded with all types of quality[-]of[-]life issues," including "an open[-]air drug distribution network," "illegal street gangs," and "people who . . . ingest[] narcotics out in the open and drink[] in public." Officer Morales testified police previously engaged in "narcotics[-]related investigations and investigations that lead to recovery of weapons, particularly of lethal firearm hangouts."

"[K]nown for violent offenses" such as "assaults," the area generated "upwards of 50 to 100 complaints" by local residents and business owners informing police of adults "loitering . . . for the sole purpose of distributing narcotics[,] . . . generally crowding up the sidewalk and streets with their illegal gambling, [and] drinking . . . and using drugs in public." Officer Morales estimated making around 100 arrests for narcotics-related offenses, recovering "approximately five to ten guns," and being aware of "approximately [sixteen] shootings" and two homicides in the area within the prior two years.

Regarding the circumstances surrounding the encounter with defendant, Officer Morales indicated the officers wore plainclothes with badges "displayed on [their] persons" to identify themselves, along with body worn cameras

4

(BWC) and holstered handguns. He described "nonstop pedestrian traffic" and "constant vehicle traffic," as police "utilize[d] multiple nondescript vehicles to set up both fixed and mobile surveillance" and drones.

Officer Morales testified they observed Little, who had been previously arrested and convicted of possession with intent to distribute, "walking back and forth between [streets] . . . for no apparent reason other than what appeared to be narcotics sales, based off of [police] training and experience." Little then engaged in a "hand-to-hand transaction" with another male who was later stopped by police and found carrying "two small tenant jugs of what [police] suspected to be crack cocaine." The two men walked on a street when "Little eventually sat on the front steps of a house . . . right next to a bush." Little then "appeared to reach into the bush and retrieve a small item which he exchanged with" the man, who was eventually apprehended.

Drones simultaneously recorded the event, and officers relayed to other officers the information regarding the suspected transaction. The State presented the drone footage at the hearing. Officer Morales described portions of the video, including Little wearing a "black puffy style coat that ha[d] a hood attached." The parties stipulated that drugs were found on the man seen with Little.

A-2905-23

Officer Morales recounted observing what appeared to be a second interaction involving Little, where he met another individual "and[,] upon having a brief conversation, the two of them walked towards that same bush where he had pr[eviously] retrieved the suspected narcotics[,] . . . suspected to be a stash location," and he again "retrieved something [small] from the bush . . . and handed it to the gentleman who then walked away." Officer Morales agreed this conduct was "consistent with [Little] engaging in a street[-]level narcotics distribution."

After the suspected second transaction, Officer Morales testified Little "met with two individuals," later identified as defendant and Conn, "who [police] had[ not] seen prior[,] and they proceeded to walk together." Officer Morales explained that "because [police] identified . . . Little as the suspected drug dealer at the time, [they] relayed that information to the units out in the field to quickly and safely apprehend [Little] as soon as possible."

The officer testified Detective Kevin Arias and Officer Juan Londono responded. Detective Arias exited an unmarked vehicle with his detective shield and BWC fully displayed, and his weapon holstered. Detective Arias "ordered the trio to stop," to which "Little did stop and the other two gentlemen took off running on foot." Specifically, Officer Morales stated "[t]hey ran in opposite

6

directions," and Conn "was observed to have dropped a handgun" just before "[a] struggle ensued[,] and he was subsequently placed under arrest."

Defendant "ran toward a nearby resident's backyard" and "was eventually apprehended and also found to be in possession of a handgun inside [his] fanny pack" along with "[fifteen] glassine envelopes of suspected heroin and . . . nine small plastic jugs of suspected cocaine." The drone recording of the incident confirmed Officer Morales's account, although no audio was recorded.

Officer Morales conceded officers never observed defendant handling a firearm or consuming drugs or alcohol on the street, and defendant and Conn "were not the target[s] of any investigation." Officer Londono's BWC footage, played at the hearing, confirmed that Officer Londono "c[ame] around the corner and . . . sa[id], 'Don't f[***]ing move,'" but did not announce he was a police officer. He testified the officers "were intending to detain . . . Little, however, if he was in close proximity to anybody, in order to conduct that arrest safely and [if] the officer felt he needed to detain everybody who was around him, that was his prerogative for his own safety purposes."

Detective Arias also testified describing the encounter, recalling he wore "plainclothes," specifically a "hoodie[]" and "jeans" but also "police gadgets" like his "holster," BWC, "radio, . . . handcuffs," and his police badge "on a chain

7

hanging around his neck." He "ma[d]e contact with" Little, defendant, and Conn after information "was relayed by [his] sergeant and . . . partner that Little . . . had [just] conducted a transaction" and the officers began "getting ready to go place Little under arrest." He described seeing "three individuals all wearing black," exiting his vehicle, and, pointing at the three with his radio in hand advising them, "Police, stop," "so [he] c[ould] assess the situation and figure out who Little was." He explained that the parties then "dispersed" and he "didn't know [who] Little was," so he began pursuing one of the individuals, later confirmed as Conn. Detective Arias's BWC footage was played, and corroborated his testimony, although Conn's jacket, while dark, was confirmed to be green in color.

Detective Arias revealed he "kn[e]w Little from a previous arrest" years earlier, but when his vehicle turned the corner and he subsequently looked to identify Little, the men were dressed similarly, so he asked them to stop moving so he could safely identify and arrest Little. Detective Arias explained this all took place "within seconds" of his arrival, and when two of the three men fled his command to stop, he assumed one was Little because "he just . . . committed a crime." Little, however, "just kind of stood there," and "somebody else" arrested him.

8

Conn's attorney argued there was no basis for law enforcement to stop either Conn or defendant as they were not involved in anything unlawful at the time, and reasonable articulable suspicion did not exist as there was "[z]ero criminality" and "running" did not justify the stop. Conn's counsel argued police could not infer that defendant or Conn knew Little had recently completed prior drug deals or that they recognized police were attempting to stop them as they wore plainclothes, making them "not easily identifiable." He also argued that Detective Arias's BWC footage showed Conn wore a green jacket, and none of the three wore masks, undermining Detective Arias's testimony that all were wearing black and he could not readily identify Little. Conn's counsel further argued flight alone cannot justify a stop.

Defendant's attorney joined and supplemented Conn's counsel's argument by noting that "mere association with someone who is the subject of an investigation is not" enough to conduct an investigatory stop. Counsel also highlighted that when the plainclothes officers began yelling, defendant understandably fled "in that split second."

The State countered that the stop was reasonable in the circumstances given the three met immediately after Little's apparent drug sales, this occurred within the high crime area, and police needed to identify and arrest Little. It

9

argued the pursuit was lawful, particularly when Conn and defendant fled, ignoring police commands to stop, in this area with a known history of shootings and drug arrests. Further, the State contended Conn and defendant's flight created a potentially dangerous situation, justifying defendant's arrest and search pursuant to his lawful arrest.

B.    The Court's Decision

The court made detailed findings deeming both officers' testimony credible. The court analyzed the facts and applicable law, and, acknowledging that "flight alone is not enough," found articulable suspicion existed for the stop. Specifically, the court recognized defendant and Conn "were talking to someone who had just been seen engaging in drug transactions, who were in a high-crime area," and video dispelled the defense's claim that these three looked nothing alike from the split-second approach by police. The court analyzed the video evidence and determined "there [wa]s absolutely no doubt whatsoever that . . . defendants . . . knew that it was the police" when they appeared and called for them to stop, finding police did not appear to be "members of the community with . . . bad intent," as defendant and Conn suggested. It also noted that at the end of the video of defendant's arrest, defendant exclaimed multiple times, "Who told on me," suggesting "defendants knew that they were involved

with the police."

Regarding the search, the court found "the totality of the circumstances . . . . amount[ed] to probable cause sufficient to . . . pursue and detain and search . . . defendants." Accordingly, the court denied defendant's motion to suppress.

## II.

Defendant appeals, raising the following arguments:

POINT I

BECAUSE THE OFFICERS' INVESTIGATORY STOP VIOLATED [DEFENDANT]'S CONSTITUTIONAL RIGHTS, THE FRUITS OF THE ILLEGAL STOP MUST BE SUPPRESSED.

A. The stop was illegal because officers had no reason to suspect [defendant] of criminal activity.

B. The fruits of the illegal stop were not attenuated and must be suppressed.

Defendant contends the officers stopped and searched him without the reasonable suspicion necessary to render the stop constitutional, arguing that police had no reason to believe defendant was engaging in criminal activity at the inception of the stop. He asserts that defendant's flight cannot be a factor in the reasonable suspicion analysis because police ordered defendant to stop before he began to run. Further, defendant argues that the police search was not

11

attenuated sufficiently from the stop, as there was a small time difference between the stop and search, defendant's "short flight was not a significant intervening circumstance capable of dispelling the . . . police action," and the flagrancy of the officers' conduct weighs in favor of suppression, as they had no reason to suspect him of criminal activity.

The State argues the officers had reasonable suspicion to stop defendant given the surrounding circumstances, including his presence with Little, who "ha[d] just been observed conducting drug sales on the street in an area beset by crime." The State further asserts "defendant's flight was not the only basis for reasonable suspicion," identifying that defendant was "affiliating with someone conducting drug trafficking in a crime-ridden location, possibly taking part in an ongoing drug enterprise." Alternatively, the State contends the stop and arrest of defendant was sufficiently attenuated from any arguable illegality when defendant fled, obstructing and resisting police.

### III.

"[O]ur review of a trial court's factual findings on a motion to suppress evidence is limited." State v. Gartrell, 256 N.J. 241, 250 (2024). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Elders, 192

N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We accord this deference because of "the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Ahmad, 246 N.J. 592, 609 (2021) (quoting Elders, 192 N.J. at 244). By contrast, "[w]e review legal determinations, including the application of the law to undisputed facts, de novo, with no special deference." State v. Nyema, 465 N.J. Super. 181, 189 (App. Div. 2020) (citing State v. Hagans, 233 N.J. 30, 38 (2018)).

IV.

The United States and New Jersey Constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. 1, ¶ 7. "Warrantless seizures and searches are presumptively invalid as contrary to the United States and New Jersey Constitutions," which both "require that such seizures or searches be conducted pursuant to a warrant issued upon a showing of probable cause." State v. Pineiro, 181 N.J. 13, 19 (2004). As an exception to the warrant requirement, police officers may conduct a brief investigatory stop during which they "may lawfully detain someone for investigatory purposes." State v. Shaw, 237 N.J. 588, 612 (2019); see also Terry v. Ohio, 392 U.S. 1, 24 (1968).

13

An officer may conduct an investigatory stop when, "'based on specific and articulable facts,' he has a reasonable suspicion that a person is engaged in criminal activity." State v. Gibson, 218 N.J. 277, 291 (2014) (quoting Pineiro, 181 N.J. at 20). Reasonable suspicion "is a less demanding standard than probable cause." State v. Goldsmith, 251 N.J. 384, 399 (2022). Nonetheless, police suspicion "will be found to be reasonable only if it is based on 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" State v. Williams, 410 N.J. Super. 549, 555 (App. Div. 2009) (alteration in original) (quoting Pineiro, 181 N.J. at 22). "[T]he totality of the circumstances of the encounter must be considered in a very fact-sensitive analysis," Goldsmith, 251 N.J. at 401, and the State must demonstrate the existence of reasonable, articulable suspicion at the inception of the stop by a preponderance of the evidence, see Pineiro, 181 N.J. at 20. Ultimately, the "touchstone" to evaluate a potential constitutional violation of this protection is "reasonableness." State v. Hathaway, 222 N.J. 453, 476 (2015).

Certain well-settled principles apply in assessing the circumstances. Flight from police is a relevant factor; however, flight alone does not give automatic reasonable suspicion to stop. See State v. Dangerfield, 171 N.J. 446, 457 (2002). Further, "although the reputation of an area may be relevant to the

analysis," a defendant's mere presence in a high crime area cannot alone justify a stop. Goldsmith, 251 N.J. at 400. Indeed, "[e]ven if all of the factors were susceptible of 'purely innocent' explanations, a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion." State v. Stovall, 170 N.J. 346, 368 (2002).

After reviewing credible evidence in the record of the circumstances known to the officers at the inception of the encounter, we discern no basis to disturb the court's finding the officers possessed reasonable and articulable suspicion to stop the group briefly to investigate and effectuate Little's arrest.

The court correctly found police had detected organized drug transactions in this "high-crime area notorious for open-air narcotics distribution," where violent crimes frequently occurred. Further, the court observed "[t]he area [wa]s directly patrolled based on complaints from concerned citizens and local business owners and . . . officials," noting this stemmed from the "numerous arrests . . . made" during which police "recover[ed] large quantities of guns, narcotics, and other weapons." The court deferred to the officers' experience recognizing "[c]ourts are to give weight to the officer[s'] knowledge and experiences and rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer[s'] expertise," citing

State v. Arthur, 149 N.J. 1, 10 (1997).  See also Pineiro, 181 N.J. at 22 ("An officer's experience and knowledge are factors courts should consider in applying the totality of the circumstances test.").

The court properly concluded that the officers' experience in narcotics investigations and knowledge of the manner in which sales were conducted in the area reasonably drew suspicion to defendant who met Little post-sale. Although police had no prior knowledge of defendant, it was not unreasonable for the court to query his presence with Little, a known drug dealer, immediately after Little was observed "engaging in drug transactions."  See State v. Harris, 384 N.J. Super. 29, 48 (App. Div. 2006) ("Undoubtedly, police may rely on their knowledge of a suspect's 'prior arrest [and conviction] record.'" (alteration in original) (quoting State v. Hayes, 327 N.J. Super. 373, 380 (App. Div. 2000))). The drone footage verified Little's methodical open-air drug dealing before joining defendant and Conn.  The officers' training and experience suggested the rendezvous of Little with others, specifically defendant, fit the structure of narcotics activities they had been surveilling.

We discern no error in the court's determination, buttressed by the video footage, that the officers presented an "overwhelming appearance of law enforcement at the scene."  We similarly recognize the drone footage confirmed

all three men wore substantially similar clothing, supporting Detective Arias's testimony that, in the seconds available to assess the situation, he reasonably decided to stop the three, at least long enough to identify and apprehend Little. We conclude the record supported a finding that these circumstances, in the aggregate, warranted the police order to stop for brief detention to investigate further and arrest Little. Defendant's flight thereafter provided probable cause to arrest and search defendant. See State v. Crawley, 187 N.J. 440, 451-52 (2006).

In addition, defendant's flight obstructed the apprehension of Little and defied reasonable police commands to stop, providing independent and sufficiently attenuated justification for the subsequent arrest and seizure of evidence. "The attenuation doctrine is an example of an exception to the exclusionary rule" and "examines whether the connection between the constitutional violation and the evidence is 'so attenuated as to dissipate the taint from the unlawful conduct.'" State v. Herrerra, 211 N.J. 308, 331 (2012) (quoting State v. Badessa, 185 N.J. 303, 311 (2005)) (internal quotation marks omitted).

In evaluating attenuation, this court weighs three factors: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2)

the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." State v. Johnson, 118 N.J. 639, 653 (1990). Temporal proximity "is the least determinative" factor. State v. Worlock, 117 N.J. 596, 623 (1990). Regarding the third factor, our Supreme Court has determined officers acting in good faith can "hardly be described as flagrant misconduct." State v. Williams, 192 N.J. 1, 16 (2007). Accordingly, "[t]he second factor, intervening events, 'can be the most important factor in determining whether [evidence] is tainted.'" Johnson, 118 N.J. at 656 (alteration in original) (quoting Worlock, 117 N.J. at 623).

We conclude under these facts that defendant's flight from police was an intervening event justifying the subsequent police pursuit breaking the chain of any arguable illegality. "[W]hen a police officer is acting in good faith and under color of his authority, a person must obey the officer's order to stop and may not take flight without violating N.J.S.A. 2C:29-1." Crawley, 187 N.J. at 451-52. That the police encounter was fast and fluid does not negate a finding of attenuation as timing is "the least determinative" factor. Worlock, 117 N.J. at 623. Moreover, nothing in the record indicates Officer Londono or Detective Arias were operating in bad faith, as both Officer Morales and Detective Arias testified their sole purpose was to apprehend Little. Defendant and Conn

18

thwarted the officers' initial lawful goal—to effectuate Little's arrest—by their flight upon police command to stop. Importantly, Officer Morales testified defendant fled and "ran toward a nearby resident's backyard" attempting to "elud[e] the police," which our Supreme Court has described as an "intervening criminal act . . . not . . . subject to suppression." Williams, 192 N.J. at 16. Accordingly, the search of defendant was sufficiently attenuated from the initial police command to stop to immunize the seizure of the evidence from any arguable unconstitutionality stemming from the stop.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2905-23