**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5799-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DEVON STOUT, a/k/a
DEVIN STOUT, and
DEVIN AGOLIO-STOUT,

    Defendant-Appellant.

_____

Submitted February 24, 2020 – Decided May 7, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-10-1463.

Joseph E. Krakora, Public Defender, attorney for appellant (David J. Reich, Designated Counsel, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Devon Stout appeals from his conviction by jury of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and fourth-degree unlawful possession of a defaced firearm, N.J.S.A. 2C:39-3(d), and the sentence imposed by the trial judge,[1] arguing:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS BECAUSE THE POLICE OFFICER DID NOT HAVE A VALID BASIS TO STOP OR SEIZE [DEFENDANT].
>
> POINT II
>
> THE IMPROPER ADMISSION OF THE POLICE OFFICER'S LAY OPINION TESTIMONY AND REMARKS BY THE ASSISTANT PROSECUTOR INDICATING [DEFENDANT] DISCARDED THE GUN WHICH WAS SUBSEQUENTLY DISCOVERED DEPRIVED [DEFENDANT] OF A FAIR TRIAL.
>
> POINT III
>
> THE TRIAL COURT ERRED IN ADMITTING [DEFENDANT'S] JAILHOUSE STATEMENT.

---

[1] The State dismissed count three of the indictment, charging fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2), before trial.

2

POINT IV

A NEW TRIAL IS REQUIRED IN VIEW OF THE
TRIAL COURT'S FAILURE TO MAKE SUFFICIENT
VOIR DIRE INQUIRY TO ENSURE THAT
DISCUSSION AMONG CERTAIN JURORS
OUTSIDE THE JURY ROOM AFTER
DELIBERATIONS HAD BEGUN DID NOT
IMPROPERLY TAINT THE JURY DELIBERATION
PROCESS.

POINT V

A REMAND IS REQUIRED IN VIEW OF ERRORS
THE TRIAL COURT COMMITTED IN IMPOSING
SENTENCE.[2]

We are unpersuaded by these arguments and affirm.

I.

In considering defendant's argument that the Asbury Park police officer who first encountered defendant had no right to stop him, we "must uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243 (2007) (quoting State v. Elders, 386 N.J. Super. 208, 228 (App. Div. 2006)). Those facts found credible by the motion judge from the

---

[2] Defendant was sentenced to a concurrent five-year term for third-degree theft, N.J.S.A. 2C:20-3(a), charged in a separate indictment, after pleading guilty to a violation of probation (VOP).

testimony of the officer at the suppression hearing reveal the officer was on patrol at approximately 9:20 p.m. on a mid-August evening when he heard "two loud pops" which he "immediately recognized" as gunshots. About thirty to sixty seconds after he heard the shots, as he proceeded in his unmarked police car to the area approximately two blocks west of his position from whence the sound of the shots came, he saw defendant walking out of a backyard and cross directly in front of the officer's vehicle.

Defendant was immediately recognizable to the officer from previous investigations, and from encounters with defendant who had been previously fired upon thrice. The officer knew defendant to be affiliated with the Bloods and that his street name was "Balie." The officer "slowed his vehicle and called . . . defendant by [his given] name," whereupon defendant looked at the officer "and immediately began to flee while clutching at his waistband."

The officer exited his vehicle and gave serpentine chase to defendant, "repeatedly shout[ing] out commands to . . . defendant, by name, . . . directing him to [']stop, police['], in a loud, clear voice." As defendant ran, the officer observed from a distance of five to ten yards in a "lightly illuminated" backyard, the silhouette of defendant's right hand motioning toward the ground and "heard a thud, consistent with something heavy landing on the ground."

Within five minutes, the officer lost sight of defendant and returned to the area where he heard the thud; there he located the handgun which defendant was charged with possessing.

We defer to the motion judge's findings, especially because they "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). The motion judge's application of his factual findings to the law, however, is subject to plenary review. State v. Cryan, 320 N.J. Super. 325, 328 (App. Div. 1999).

Defendant's present contention that the motion judge "incorrectly assumed that the stop and seizure of [defendant] did not occur until after the police officer began to chase him on foot rather than when the police officer first confronted [defendant] from his motor vehicle" is at odds with the motion judge's perception, "[b]ased on the submissions of both parties['] counsel . . . that the seizure occurred when [the officer] began chasing . . . defendant." We were not provided with those submissions. See R. 2:6-1(a)(2). As such, we do not know what defendant contended therein. But if the motion judge correctly explained defendant's position—and we have no reason to doubt he did, especially

considering defendant did not deny that position in his merits brief—the concession that the stop did not occur until the officer gave chase amounts to invited error which bars a party from taking a position on appeal contrary to a position advanced to the motion judge. See State v. Pontery, 19 N.J. 457, 471 (1955). "Elementary justice in reviewing the action of a [motion judge] requires that [the judge] should not be reversed for an error committed at the instance of [the] party alleging it." State v. Scioscia, 200 N.J. Super. 28, 47 (App. Div. 1985) (third alteration in original) (quoting Bahrey v. Poniatishin, 95 N.J.L. 128, 133 (E. & A. 1920)).

Nonetheless, we find no such error was committed by the motion judge. "A 'field inquiry' is the least intrusive" form of police encounter, occurring "when a police officer approaches an individual and asks 'if [the person] is willing to answer some questions.'" State v. Pineiro, 181 N.J. 13, 20 (2004) (alteration in original) (quoting State v. Nishina, 175 N.J. 502, 510 (2003)). "[A] field [inquiry] is not a Fourth Amendment event 'so long as the officer does not deny the individual the right to move.'" State v. Egan, 325 N.J. Super. 402, 409 (Law Div. 1999) (quoting State v. Sheffield, 62 N.J. 441, 447 (1973)); see also State v. Rosario, 229 N.J. 263, 273-74 (2017) (citing Egan favorably). The

officer is permitted to ask questions during the field inquiry as long as they are not "harassing, overbearing, or accusatory in nature." Nishina, 175 N.J. at 510.

By contrast, an investigatory stop, familiarly known as a Terry stop, occurs when police detain a person who would not reasonably feel free to leave, even though the encounter falls short of a formal arrest. State v. Stovall, 170 N.J. 346, 355-56 (2002); see also Terry v. Ohio, 392 U.S. 1, 21 (1968). Under Terry, a police officer can detain an individual for a brief period, if the stop "is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126-27 (2002) (quoting Terry, 392 U.S. at 21). Under this standard, "[a]n investigatory stop is valid only if the officer has a 'particularized suspicion' based upon an objective observation that the person stopped has been [engaged] or is about to engage in criminal wrongdoing." State v. Davis, 104 N.J. 490, 504 (1986).

Applying these principles and our standard of review, we discern no basis for disturbing the motion judge's determination that the stop and subsequent search were valid. By calling defendant's name, the officer did not conduct an investigatory stop. Indeed, although his clear purpose was to inquire about defendant's knowledge, if any, about the gunshots, the officer did not even have

an opportunity to pose a question to defendant before he ran. Obviously, defendant did not feel compelled to remain at the location. See Rosario, 229 N.J. at 271-72 ("The test of a field inquiry is 'whether [a] defendant, under all of the attendant circumstances, reasonably believed he [or she] could walk away without answering any of [the officer's] questions." (first and third alterations in original) (quoting State v. Maryland, 167 N.J. 471, 483 (2001))). To that point in time, the encounter was no more than a field inquiry.

That inquiry quickly escalated to a Terry stop when the officer gave chase, announced he was a police officer—a status evidenced by the officer's neck-worn badge and top with "police" emblazoned in large silver lettering on front and back—and commanded him to stop. See State v. Tucker, 136 N.J. 158, 166 (1994) (holding an investigatory stop occurs when police officers chase a suspect and, under the totality of the circumstances, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter" (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991))). We agree that defendant's flight alone did not justify a Terry stop. State v. Williams, 410 N.J. Super. 549, 555 (App. Div. 2009).

"However, flight 'in combination with other circumstances . . . may support [the] reasonable and articulable suspicion' required to justify a stop." Ibid. (alterations in original) (quoting Pineiro, 181 N.J. at 26); see also State v. Citarella, 154 N.J. 272, 281 (1998) (recognizing flight as one factor justifying police chase of a bike rider who was a known narcotics offender acting suspiciously); State v. Morrison, 322 N.J. Super. 147, 155-56 (App. Div. 1999) (upholding the stop of a fleeing suspect based upon high-narcotics area and resident complaints of his involvement in drug sales); State v. Ruiz, 286 N.J. Super. 155, 163 (App. Div. 1995) (holding the stop of a fleeing suspect was justified based upon prior arrests and suspicious conduct).

Unlike the defendant in Tucker, who was observed by police simply sitting on a curb before he fled, was chased and stopped, 136 N.J. at 161-62, the totality of the circumstances justified the officer's pursuit of defendant. The stop began only after defendant ran and immediately clutched at his waistband, signaling to the officer that defendant was armed with a weapon. As the officer testified, based on his training and experience, "[s]ubjects who carry firearms typically keep them in their waistband area or conceal them in their waistband area rather." That the clutching may have been unrelated to defendant's attempt to retain a firearm does not discount the officer's reasonable suspicion.

In evaluating the facts giving rise to the officer's suspicion of criminal activity, courts are to give weight to "the officer's knowledge and experience" as well as "rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as "a reasonable person would find the actions are consistent with guilt."

[Citarella, 154 N.J. at 279-80 (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)).]

Defendant's actions, combined with his proximity to the area in which the gunshots were heard shortly after the gunfire, and his prior involvement as the target of shootings, justified the investigatory stop.[3]

The motion judge likened the circumstances of this stop to those in State v. Dunbar, 434 N.J. Super. 522 (App. Div. 2014), where we determined an investigatory stop was justified when officers, who "arrived within moments of the report of shots being fired," observed a nervous defendant duck into an alley,

---

[3]  Defendant contends the motion judge incorrectly found defendant was a "defendant in . . . weapon and shooting investigations," and not the target of same. We do not agree with that interpretation. Viewing the entirety of the judge's oral opinion, we understand the judge meant the officer knew defendant as a victim of prior shootings and as a defendant in cases relating to drugs and criminal trespass. In any event, we consider only that the officer knew defendant in that light, not as a person who had been previously arrested on gun charges.

began to walk away "while looking over his shoulder at" police, did not respond when an officer attempted to speak to him and, instead, ran, id. at 527-28. We agree that the circumstances here similarly justified the stop. And, as we did in Dunbar, we observe defendant discarded the handgun as he "ignored the police directive to stop and was attempting to flee the scene," and that the police "had reason to fear that the suspect might be armed." Id. at 528. To those circumstances, we add defendant in this case had a known gang affiliation and concomitant reputation for carrying handguns.

Inasmuch as both the officer's attempted initial inquiry and investigatory stop fell within the delineated exceptions to the warrant requirement, Maryland, 167 N.J. at 482; Pineiro, 181 N.J. at 19-21, the seizure of the handgun was constitutionally permissible, and the motion to suppress was properly denied.[4]

II.

Defendant argues the officer's lay opinion linking the thud he heard to the handgun he found did not meet the requirements of N.J.R.E. 701 and should have also been excluded under N.J.R.E. 403(a). He adds, the officer's testimony that defendant's extension of his right arm as he ran suggested to the officer that defendant "was discarding something in a discrete manner," was also

---

[4] The issue of abandonment of the handgun was not raised on appeal.

inadmissible lay opinion. Defendant also avers the officer's testimony that nothing else on the ground in the area where the handgun was found could have made that sound was, likewise, inadmissible lay opinion.

The officer described to the jury his observation of defendant's arm motion as he ran, extending "to the side of his body towards the ground, so his right arm basically just went into a straight extension" "at which point [the officer] heard a loud thud on the ground as if a heavy object just fell into the ground." He explained that arm angle was different from the angle defendant had otherwise assumed as he ran—with his arms "slightly bent at the elbow"—and provided the jury with a demonstration of the difference between that angle and the defendant's arm "fully extended facing the direction of the ground."

The officer later testified that other items—small branches, small rocks, leaves, small shreds of wood and an empty fifteen- or twenty-gallon plastic bin—he observed on the ground near the handgun, and which were depicted in photographs of that area posted to the jury could not have made the "thud" he heard.

Defendant did not interpose an objection under either N.J.R.E. 701 or N.J.R.E. 403(a).[5]  Unless defendant timely made the "objection to admission known to the trial court, the reviewing court will review for plain error, only reversing if the error is 'clearly capable of producing an unjust result.'"  State v. Rose, 206 N.J. 141, 157 (2011) (quoting R. 2:10-2).  "Under that standard, defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights."  State v. Morton, 155 N.J. 383, 421 (1998).

Most of the officer's testimony centered on his perceptions; those were not lay opinions.  The description of defendant's arm motion described defendant's actions at the point the officer heard the "thud" that caused him to return to the area where he found the handgun.  His description that it was "a loud thud" and that "[i]t was a heavy object that hit the ground" cannot be viewed as anything

---

[5] When the assistant prosecutor asked, "What if anything did [defendant's arm] motion suggest to you?" defendant objected that it "calls for speculation"; the objection was overruled.  Defendant also objected twice that the assistant prosecutor asked questions calling for an expert opinion.  The first objection was followed by a sidebar, whereafter the assistant prosecutor rephrased the question and asked the officer if "there [was] anything else on the ground in that area that could have made the ['thud'] noise" the officer heard; no objection was made to that question and answer.  Defendant made the same objection when the assistant prosecutor asked if any other items on the ground could have made the "thud"; that objection was overruled.

but the officer's recount of what his senses perceived. The same holds true for the officer's description of the defendant's arm movement.

Even if the descriptions included lay opinion, they were admissible, as was the officer's testimony that there was nothing else on the ground that could have made the "thud." Lay opinion is admissible under N.J.R.E. 701 which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

"Lay opinion testimony, therefore, when offered . . . in criminal prosecutions, can only be admitted if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). "The witness's perception must 'rest[] on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing.'" State v. Hyman, 451 N.J. Super. 429, 442 (App. Div. 2017) (alteration in original) (quoting McLean, 205 N.J. at 457). Further, lay opinions "may not intrude on the province of the jury by offering, in the guise of opinions, views on the

A-5799-17T4

meaning of facts that the jury is fully able to sort out . . . [or] express a view on the ultimate question of guilt or innocence." McLean, 205 N.J. at 461. Police officers are allowed "to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. LaBrutto, 114 N.J. 187, 198 (1989).

The officer had extensive experience in firearms. He testified that he had been a police officer in two municipal departments for about seven years, and was previously "in the military security forces, Air Force." He not only received firearms training at the police academy and was required to requalify biannually, he had participated in over 100 firearms-related investigations and had made dozens of firearms-related arrests as a police officer. He was thus familiar with the heft of handguns. His description of the sound he heard obviously related to his perception as he chased defendant, satisfying the first prong of N.J.R.E. 701.

His testimony also assisted the jury in understanding the "thud" he heard. Notwithstanding the photographs of the area, including the other objects on the ground near the handgun, the jury was not present at the scene to visualize the other debris. The officer's description of the "thud" did not impart to the jury the volume or timbre of that noise. We see nothing improper about the officer

distinguishing the sound he heard from sounds that could be made from the other items. The determination that defendant possessed the handgun was left entirely to the jury which could have rejected the inference that defendant possessed the handgun and discarded it during the chase. Thus, the testimony did not intrude on the jury's province or express the officer's view of defendant's guilt. McLean, 205 N.J. at 461.

The balance of defendant's arguments about the officer's testimony and the assistant prosecutor's comments thereon are without sufficient merit to warrant discussion. R. 2:11-3(e)(2). Again, defendant did not object that the evidence should have been excluded on the grounds the probative value of relevant evidence was "substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403(a). Indeed, such an objection would have been baseless. The evidence was relevant and admissible; the assistant prosecutor's comments were within the "considerable leeway" the State's attorney is afforded in opening and closing statements. State v. Echols, 199 N.J. 344, 359-60 (2009) (quoting State v. Williams, 113 N.J. 393, 447 (1988)). And, neither the admission of the officer's

16

testimony, nor the assistant prosecutor's comments were "clearly capable of producing an unjust result." See Rose, 206 N.J. at 157 (quoting R. 2:10-2).

### III.

Defendant also contends the trial judge erred in denying his April application to: preclude the State from introducing a conversation among defendant, his father and girlfriend recorded when defendant was in the county jail because the State "flagrantly violated" the discovery Rule; and, once admitted, to redact that recording.

In denying the motion, the trial judge considered that, when defendant was arraigned in November 2017, the State demanded, pursuant to Rule 3:12-2(a), that defendant file a notice of alibi within ten days. Defendant, however, did not serve the signed notice until February 2018, after plea cutoff on January 30, 2018; the State received an unsigned notice "[a]bout a week prior to that[.]" At oral argument on the motion, defense counsel claimed the tardy service was unintentional; he was not "confident providing . . . a[n] alibi defense" until he talked to witnesses, some of which he "had trouble tracking down[.]" Upon receiving the notice, the State "launched an investigation" that led to what the

State at oral argument termed a "request" to the county jail on March 14, 2018;[6] the State noticed defense counsel of that request. The State forwarded what defense counsel described at oral argument as "697 jail calls . . . rang[ing] from one minute to [fifteen] minutes and, on average, they were ten minutes" which counsel received on April 2, 2018 "at the earliest[.]" The State, however, advised defense counsel in an email of a narrower focus, and later provided a transcript of just one fifteen-minute call that it intended to use.

The trial judge observed that defendant's notice of alibi was served after the plea cutoff, and the State, instead of moving for preclusion of defendant's alibi proofs, see R. 3:12-2(b), "conducted an additional investigation," subpoenaed the phone records "and provided [them] to the defense as soon as practicable." The judge found "the State did not sit on this information or . . . sit on conducting any investigation. [It] acted . . . reasonably promptly as soon as [it] received the notice of alibi."

The trial judge permitted defendant to interpose an alibi defense despite his "untimely notice to the State" and permitted the State to introduce the

---

[6] In its merits brief, the State averred it sent a grand jury subpoena "seeking defendant's jail calls to the [county jail]." The subpoena is not part of the record.

recording of the single phone call "which the defense . . . had an opportunity to hear and to review[.]" The judge found the call

> certainly relevant to refute the alibi defense insofar as it appears that the phone call indicates first that -- defendant first advises his father that he's at his mother's home and then later on he says, ["]well, I was actually at the scene but I was running.["] That statement coming from . . . defendant's own mouth is probative on the issue of whether or not the defense can sustain its burden on the alibi defense.

We see no abuse of discretion in the trial judge's ruling. State v. Brown, 236 N.J. 497, 522 (2019). Although Rule 3:13-3(b)(1) requires that the State provide post-indictment discovery "upon the return or unsealing of the indictment," the duty to disclose discovery is continuing, R. 3:13-3(f). Trial judges are invested with broad discretion in determining appropriate sanctions for discovery violations. State v. Marshall, 123 N.J. 1, 130 (1991). When a trial judge perceives

> that a party has failed to comply with [Rule 3:13-3(f)] or with an order issued pursuant to this [R]ule, [the judge] may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or [the judge] may enter such other order as [the judge] deems appropriate.

[R. 3:13-3(f).]

"An adjournment or continuance is a preferred remedy where circumstances permit." State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002).

We defer to such determinations unless that are "wide of the mark" or "based on a mistaken understanding of the applicable law." State v. Washington, 453 N.J. Super. 164, 180 (App. Div. 2018) (quoting State v. Hernandez, 225 N.J. 451, 461 (2016)). That, certainly, is not the case here where the trial judge's ruling accomplished the goal of the discovery rules: "to accomplish fairness," State v. Bellamy, 329 N.J. Super. 371, 376 (App. Div. 2000) (quoting State v. Kearney, 109 N.J. Super. 502, 505 (Law Div. 1970)), and their principal purpose: "to assure the parties every legitimate avenue of inquiry prior to trial to enhance the search for the truth," State v. Burnett, 198 N.J. Super. 53, 58 (App. Div. 1984). Obviously, defendant was aware of the call and its contents; he was a participant. He did not claim surprise or request a continuance; there is no evidence he suffered any prejudice from the timing of the recording's delivery to his counsel. The trial judge properly applied his discretion in denying defendant's preclusion application.

Likewise, the trial judge did not abuse his discretion in denying defendant's application to redact that portion of the recording which he now

contends could have led the jury to "conclude[] that the reference to [a judge other than the trial court judge] related to an earlier case" involving defendant. Defendant avers he appeared before the other judge for a detention hearing relating to this case and on an unrelated theft charge.  The portion of the recording, as related in defendant's merits brief, is a conversation defendant had with his father:[7]

> [DEFENDANT'S FATHER]:  Wednesday and Thursday I gotta work right now.  (inaudible)  You have court Thursday.  What time is court on Thursday?
>
> [DEFENDANT]:  I think court is in the morning, early morning.  It's in front of the same judge that I went to.
>
> [DEFENDANT'S FATHER]:  Where?
>
> [DEFENDANT]:  In Freehold.
>
> [DEFENDANT'S FATHER]:  Where, [defendant]?
>
> [DEFENDANT]:  In Freehold.
>
> [DEFENDANT'S FATHER]:  In the Freehold court house?
>
> [DEFENDANT]:  Yes, in front of [a judge other than the trial judge].
>
> [DEFENDANT'S FATHER]:  The same judge?

---

[7]  The transcript of the call is largely "[i]ndicernible," but the State does not dispute defendant's version of the call.

[DEFENDANT]: Yeah, [a judge other than the trial judge].

[DEFENDANT'S FATHER]: You sayin . . . [s]ame judge?

[DEFENDANT]: Yes, dad.

[DEFENDANT'S FATHER]: Same lady that said ["]hey listen, you know you (inaudible) fuckin['] problem.["]

We note the call does not reference the nature of the proceedings before the other judge. No mention of any other crime is made, including the prior theft. As the trial judge recognized, the jury knew defendant had criminal charges. No inference to another crime or bad act could have reasonably been drawn from that portion of the recording. Defendant's father's reference to "[s]ame lady that said [']hey listen, you know you (inaudible) fuckin['] problem[']," contains neither context of the judge's alleged remark or the subject of same. Although it may have been ordered redacted in an abundance of caution, we discern no abuse of discretion by the judge's admission. And, even if error, the fleeting, ambiguous statement was not "clearly capable of producing an unjust result[.]" R. 2:10-2.

IV.

Following the commencement of jury deliberations, the trial judge advised the collective jury, including alternates, "it has come to my attention that during the lunch recess one or two of the jurors, either the [twelve] jurors that were selected or the two alternates or some combination of the two, were discussing the case in contravention of my instructions not to do so." The record does not reveal who advised the judge of the juror transgression or what was disclosed to him. Defense counsel, in arguing for a mistrial after each of the jurors was questioned by the court out of the presence of any other juror, told the judge

> based on the information I received from the deputy, stated (sic) someone must be guilty because it was on video, something along those nature of the lines (sic), he clearly states he doesn't recall the statements that he made. And I don't know the extent if it was just the jury members or they (sic) received any input from anybody else that was in line, or if it was just tailored to just those four jurors

who had admitted having discussions in the lunch line. The record does not reveal the source of the information imparted to the judge by defense counsel.

The trial judge appropriately took "action to assure that the jurors ha[d] not become prejudiced as a result of facts which 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal

proofs and the court's charge.'" State v. Bisaccia, 319 N.J. Super. 1, 12 (App. Div. 1999) (quoting State v. Scherzer, 301 N.J. Super. 363, 486 (App. Div. 1997)). "[W]here . . . there is the possibility of actual juror taint or exposure to extraneous influences (including jury misconduct and 'comments made to jurors by outside sources'), the judge must voir dire that juror and, in appropriate circumstances, the remaining jurors." Id. at 13 (quoting Scherzer, 301 N.J. Super. at 486).

The judge asked each juror if they discussed the case with anyone during the lunch recess. Juror number two admitted discussing her "past experience as a juror[; j]ust about the process itself," but denied discussing "the case at all." Eight jurors denied having or overhearing any conversation. Juror number four denied having any conversations but was not asked if she overheard any discussions; she, however, ate lunch in her car and saw her fellow jurors "[j]ust at the end in front of the elevator" so she was not present in the room in which four of the jurors admitted having discussions.

Juror number one admitted overhearing a discussion in the lunch line about "[h]ow do we get things read back and things like that," but did not remember "exactly what was said[.]" The juror said the discussion "wasn't pertinent to any of the facts or anything like that. We were basically trying to

figure out . . . if we could ask questions and stuff like that." Juror number one said the discussion "took place [for] like maybe a minute and then we shut up." Juror number six also said she overheard a discussion in the lunch line between two jurors "about process . . . like when can you ask questions and filling out the piece of paper."

Juror thirteen said she was in the cafe "just kind of talking about what we could ask and not [ask,] but nothing, no evidence or names or anything like that was brought up. And then we just - - you know, we were, like, it's not the place." Further questioning by the judge elicited that there were a few jurors behind her, but "it wasn't like a discussion. It was just a couple, few words" but reiterated "nobody brought anything up of . . . any names or evidence[.]"

Juror fourteen admitted he "probably did say one or two things" while in line but did not "remember what they were." He responded to further questioning that he believed they were comments, not questions. Pressed by the judge, he said he thought the comments were prompted by questions the jurors could ask. During continued colloquy, he said the communication took twenty-five to fifty seconds and took place only in the lunch line.

From our review of the trial judge's voir dire, we see no abuse of discretion. State v. R.D., 169 N.J. 551, 559-60 (2001). The judge ascertained

from each juror what was discussed or what was overheard. The judge's questioning was not cursory. He did not simply accept a juror's brief answers.

We are unpersuaded by defendant's contention that the judge should have explicitly asked each juror if they said or heard that "someone must be guilty because it was on video." The judge's initial comments to the jury reveal he was advised that one or two jurors had a discussion about the case. Only defense counsel stated that there was a discussion about defendant's guilt based on a video. Unless one of the jurors admitted saying or hearing that comment, or if a reliable source for that information was before the judge—and we see no evidence that it was[8]—it would have been imprudent for the trial judge to impart such information, claimed now by defendant to be so prejudicial so as to warrant a mistrial, to the jury. There was no evidence the jury was tainted. The trial judge sagely maintained that status and did not unnecessarily highlight a portion of the evidence—the video.

---

[8] The "deputy" who purportedly revealed the comment to defense counsel is not identified in the record. Moreover, the source of the deputy's information is unknown.

V.

Defendant argues the trial judge erred by: (1) failing to take into account defendant's rehabilitative efforts to address his drug addiction after arrest and before sentencing; (2) "plac[ing] weight on [defendant's] failure to show remorse"; and (3) "impos[ing] the maximum possible sentence for [defendant's VOP] without fully explaining how a sentence of that duration was warranted."

We "review sentencing determinations in accordance with a deferential standard," and "must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We will affirm a sentence, unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

At the June 2018 sentencing, the trial judge properly exercised his discretion when he based his finding of aggravating three, N.J.S.A. 2C:44-

1(a)(3) (risk of reoffense), on defendant's "daily ingestion of marijuana and Percocet" through August 2017, and defendant's failure to complete an intensive outpatient treatment program, noting defendant's failure to attend a group session on February 27, 2018. The judge also recognized defendant's ingestion of Xanax on five occasions. Defendant also pleaded guilty on the sentencing date to violating probation, in part, by testing positive for drugs, thereby failing to comply completely with the substance abuse treatment condition of probation. Against this history, the judge was warranted in rejecting defendant's claim that his efforts at post-arrest rehabilitation negated aggravating factor three. We also note defendant received jail credits from August 31, 2017 to September 7, 2017 and November 3, 2017 through the day prior to sentencing; and gap time from September 8, 2017 through November 2, 2017. He was thus incarcerated during his purported "clean time," the period during which he claims he was drug-free.

We determine defendant's remaining arguments to be without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). We add only that the judge recognized defendant's lack of remorse as one of the many reasons he found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter), a practice we sanctioned in State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991). Further, defendant's notice of appeal does not list or reference the indictment on

which he was sentenced for third-degree theft after the VOP; and his criminal case information statement merely references his guilty plea on that VOP without challenging it. We, therefore, need not address the arguments relating to the VOP sentence because we have made clear "it is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review[.]" 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004). We will not review an order if the appellant "did not indicate in his notice of appeal or case information statement that he was appealing from the order[.]" Fusco v. Bd. of Educ. of Newark, 349 N.J. Super. 455, 460 (App. Div. 2002).

Nevertheless, our review of the presentence reports for both indictments leaves us unpersuaded that the five-year sentence the trial judge imposed on the theft—concurrent to defendant's sentence on the weapons conviction—was not supported by the same aggravating factors—three, six, (extent of prior criminal record and seriousness of offenses), and nine, N.J.S.A. 2C:44-1(a)(3), (6), and (9)—found by the original sentencing judge; and that the mitigating factors, six, (defendant has or will compensate the victim of his or her conduct for the damage or injury that he or she sustained, or will participate in a program of community service), ten, (defendant is likely to respond positively to

29

probationary treatment), and eleven, (excessive hardship that imprisonment would bring to defendant or his or her dependents), N.J.S.A. 2C:44-1(b)(6), (10) and (11), none of which were requested of or found by the trial judge in connection with either sentence, still applied. The latest presentence report indicates: defendant has never held a job "on the books" and there is no evidence he ever paid restitution; he violated probation; and no evidence was proffered regarding excessive hardship.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5799-17T4