**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5409-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ARVIN A. RIVAS,

     Defendant-Appellant.

_____

> Submitted November 10, 2020 – Decided December 2, 2020
>
> Before Judges Haas and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-02-0089.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).
>
> Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Albert Cernadas, Jr., Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial court denied his motion to suppress, a jury convicted defendant of two counts of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1).  After merger, defendant was sentenced to a four-year prison term without any parole disqualifiers and assessed applicable fines and penalties.

Defendant raises the following issues on appeal:

POINT I

> DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED.

POINT II

> THE SENTENCE OF FOUR YEARS IN NEW JERSEY PRISON WAS EXCESSIVE.

After reviewing the record in light of the contentions on appeal and the applicable law, we affirm.

## I.

On August 20, 2015, the Plainfield Police Division (Division) received a tip that a "[h]ispanic male and white female were distributing heroin" from a McDonald's in Plainfield.  A few days later, the North Plainfield Police Department notified the Division that one of their sources identified Melissa McPartland (McPartland) as the white female.  This source also provided the

phone number that McPartland purportedly used to conduct narcotic transactions.

Shortly thereafter, Detective Joseph Mulligan of the Division texted the phone number and arranged an undercover purchase for "ten folds of heroin." After further communications, the Division decided that Detective Michael Metz would make the undercover purchase at Plainfield High School. In preparation, the Division equipped Detective Metz with a "wireless [audio] transmitter" so other detectives could monitor the transaction. The Division also provided Detective Metz with $80 of marked currency which would be used to purchase the heroin.

When Detective Metz arrived at the location no one else was present. He reinitiated contact with the individual who had previously texted Detective Mulligan and was directed to go to a second location at Cedar Brook Park. Once there, Detective Metz received a phone call from a different number. The caller, who had a female voice, instructed Detective Metz to go to yet a third location in Plainfield on Laramie Road. After arriving at that location, "he observed a white female who was later identified as . . . McPartland." Detective Metz then pulled over and McPartland entered the front passenger side of his undercover vehicle.

A-5409-17T1

Once in the vehicle, McPartland pulled several glassine folds of heroin out from her bra. McPartland then placed the heroin back in her bra and told Detective Metz that it was "trash" and she was "going to get better stuff from someone named Ace." McPartland stated that Ace lived on Arlington Avenue in Newark and that defendant was going to assist in the transaction. McPartland also stated that Ace drove a red Pontiac.

Detective Metz was aware from his "dozens" of investigations that Arlington Avenue was a high crime area where narcotics were sold. He also believed that Ace was Malik Canty (Canty) based on the identifying information provided to him by McPartland. In this regard, Detective Metz stated that he was familiar with Canty through previous investigations and knew that he drove a red Pontiac, lived on Arlington Avenue, that his street name was "Ace," and that he sold heroin.

Detective Metz then noticed defendant approach the vehicle's front passenger side and speak with McPartland. He handed defendant $70 in marked currency which was understood to be for the heroin. Defendant stepped away and used his cellphone to contact an individual who Detective Metz thought was Canty. When defendant was finished with the conversation, he entered the

vehicle's rear seat and instructed Detective Metz to drive to an area near Arlington Avenue and Woodbine Avenue.

At some point during the ride, defendant told McPartland that he "need[ed] something to put [the heroin] in." McPartland then handed defendant the plastic wrapping from a cigarette container.

Upon arrival, defendant exited the vehicle and approached the side of a house located on Arlington Avenue where he met with Canty. Sergeant Troy Alston, one of the back-up units already at the location, observed defendant "hand[] . . . what [he] believed to be currency" to Canty. Sergeant Alston further noted that he saw Canty "look[] at [the money] real quick and then place[] it in his pocket." Sergeant Alston stated that he monitored the conversations in Detective Metz's vehicle via the audio transmitter and that he too was familiar with the residence on Arlington Avenue and Canty from previous narcotics investigations.

Defendant and Canty then walked to the rear of the house outside of Sergeant Alston's view. Soon after, however, Sergeant Alston saw defendant reappear and adjust his waistband. Defendant then re-entered the vehicle, indicated that they "were good," and instructed Detective Metz to drive back to Laramie Road. Detective Metz then handed defendant $10 "as a tip."

As Detective Metz turned down Laramie Road, back up units stopped the car. Defendant was subsequently arrested and searched resulting in the seizure of twenty-seven glassine envelopes of heroin, a cell phone, and Suboxone.[1]

Defendant filed a motion to suppress in which he claimed his arrest and the subsequent search violated his Fourth Amendment rights as the police did not have probable cause to stop the vehicle and arrest him. The court denied the motion in an August 24, 2017 order, and in its accompanying oral decision found that "the totality of the circumstances in this case, as viewed by a reasonable [o]fficer with the knowledge, training, and experience of [Sergeant] Alston and Detective Metz, establishes there was probable cause to arrest [defendant]." The court accordingly concluded that "the items that were found on [defendant's] person as search is incident to arrest are . . . admissible."

In support of its decision the court found that Sergeant Alston:

> directly saw [defendant] hand what he believed was money to . . . Canty. The exchange of what he believed to be U.S. [c]urrency. The observation was based on [Sergeant] Alston's training and experience, as well as him . . . visually seeing . . . Canty appear to be counting what was given to him in a manner typical of someone counting currency.

---

[1] Suboxone is a controlled dangerous substance, N.J.S.A. 2C:35–10(a)(1), and used to treat opioid dependence.

A-5409-17T1

> [Sergeant] Alston also saw the object being put into Canty's pocket, which he believed was consistent with it being cash money.

The court also noted that "[t]he location that defendant . . . direct[ed] [Detective Metz] to is considered a . . . high crime area . . . [and t]he exact house [was] known among [l]aw [e]nforcement [o]fficers as one where controlled dangerous substances [we]re sold and purchased." In turn, the court found that "it [wa]s reasonable to believe that when . . . defendant . . . disappeared for a brief moment and reappeared shortly thereafter, that a crime had been committed, namely the sale of . . . [controlled dangerous substances]."

The court reasoned that the matter was more akin to a "hand-to-hand transaction[] . . . in a high crime [area]" as in State v. Moore, 181 N.J. 40 (2004), as opposed to the circumstances in State v. Pineiro, 181 N.J. 13 (2004). The court noted that in Moore, "the [o]fficers were able to witness an exchange of U.S. [c]urrency and an unidentified item" whereas in Pineiro, "all that the police saw were two individuals on a street corner in a high crime area passing a pack of cigarettes from one person to another." The court explained that here:

> [T]he [o]fficer witnessed what he believed was an exchange of currency within a high crime . . . area between someone who he knew to be involved in the dealing of drugs . . . in the context of this undercover buy. When you look at the facts, taking the totality of the circumstances, consider the experience and training

7

of the [p]olice [o]fficers in this case, it does result in a finding of probable cause.

As noted, defendant was convicted of third-degree possession of a controlled dangerous substance and sentenced to a four-year prison term. Before issuing its sentence, the court applied aggravating factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), based "upon [defendant's] extensive juvenile record." The court noted that defendant "has eight adjudicated delinquencies" and several violations of parole. The court also found that defendant had "receiv[ed] stolen property in 2001" and "lack[ed] stable employment."

The court also applied aggravating factors six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted," N.J.S.A. 2C:44-1(a)(6), and nine, "[t]he need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9), based upon defendant's "record as an adult." The court noted that defendant was previously convicted of possession, distribution of imitation drugs, and shoplifting. The court concluded that "[t]here's a need clearly, a real and definite need to deter [defendant] from engaging in criminal activity in the future." This appeal followed.

8

## II.

In his first point, defendant contends that the court erred in denying his motion to suppress because the police lacked probable cause "for the warrantless stop of his motor vehicle and the subsequent search and seizure." Defendant further contends that he was subject to an improper Terry stop. See Terry v. Ohio, 392 U.S. 1, 19 (1968). We disagree with both arguments.

Our review of the trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). "An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Robinson, 200 N.J. at 15 (alteration in original) (quoting State v.

9

Elders, 192 N.J. 224, 244 (2007)). "We owe no deference, however, to conclusions of law made by trial courts in deciding suppression motions, which we instead review de novo." State v. Brown, 456 N.J. Super. 352, 358-59 (App. Div. 2018) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

Applying the de novo standard of review to the motion judge's legal conclusions, "[w]e review this appeal in accordance with familiar principles of constitutional law." State v. Robinson, 228 N.J. 529, 543 (2017). "Both the United States Constitution and the New Jersey [c]onstitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012) (citing U.S. Const. amend. IV; N.J. Const. art. I, para. 7).

Thus, searches and seizures conducted without a warrant "are presumptively invalid as contrary to the United States and the New Jersey Constitutions." Pineiro, 181 N.J. at 19 (citing State v. Patino, 83 N.J. 1, 7 (1980)). As such, "the State must demonstrate by a preponderance of the evidence" that "[the search] falls within one of the few well-delineated exceptions to the warrant requirement." Id. at 19-20 (alteration in original) (quoting State v. Wilson, 178 N.J. 7, 13 (2003); State v. Maryland, 167 N.J. 471, 482 (2001)).

One exception to the warrant requirement authorizes the warrantless search of persons incident to their lawful arrest. See United States v. Robinson, 414 U.S. 218, 225 (1973). Indeed, because a lawful "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment[,] . . . a search incident to the arrest requires no additional justification," and the mere "fact of the lawful arrest which establishes the authority to search" justifies "a full search of the person." Ibid.; see also State v. Dangerfield, 171 N.J. 446, 461 (2002).

Probable cause to arrest is "something less than [the] proof needed to convict and something more than a raw, unsupported suspicion." State v. Davis, 50 N.J. 16, 23 (1967). Probable cause exists when the totality of the facts and circumstances presented to the arresting officer would support "a [person] of reasonable caution in the belief that an offense has been or is being committed." State v. Sims, 75 N.J. 337, 354 (1978) (quoting Draper v. United States, 358 U.S. 307, 313 (1959)).

The Supreme Court in Moore explained the standard for probable cause:

> We have often stated that the probable cause standard is not susceptible of precise definition. Nevertheless, our jurisprudence has held consistently that a principal component of the probable cause standard "'is a well-grounded suspicion that a crime has been or is being committed.'" "Probable cause exists where the facts

11

and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."

In determining whether there is probable cause, the court should utilize the totality of the circumstances test . . . . That test requires the court to make a practical, common sense determination whether, given all of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." The factors to be considered in applying that test include a police officer's "common and specialized experience," and evidence concerning the high-crime reputation of an area. Although several factors considered in isolation may not be enough, cumulatively these pieces of information may "become sufficient to demonstrate probable cause."

[181 N.J. at 45-46 (citations omitted).]

As the trial court correctly found, based on a "totality of the circumstances," the arresting officers had a "well-grounded suspicion" that a narcotics transaction occurred. Indeed, Sergeant Alston testified at the suppression hearing that he was aware of several narcotics investigations involving Canty at the time of defendant's arrest. Sergeant Alston further noted that the Arlington Avenue area was a narcotics "problem area" and on a prior occasion he physically "went into the downstairs apartment [of the Arlington

Avenue home] and located a quantity of drugs."  Moreover, Sergeant Alston stated that he saw defendant exchange what he believed was currency with Canty and "adjust his pants" as he returned to Detective Metz's vehicle.

Further, Sergeant Alston was able to hear Detective Metz's conversation with defendant and McPartland throughout this incident via the audio transmitter.  When police are involved in a collaborative investigation, the probable cause analysis is not limited to the knowledge possessed by the officer who effects the arrest.  See United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) (citations omitted) ("The collective knowledge of the investigating officers is measured in determining probable cause."); see also State v. Crawley, 187 N.J. 440, 457 (2006).

In disputing that the arresting officers had probable cause for his arrest and attendant search, defendant compares this case with Pineiro.  We are not persuaded.  In Pineiro, an officer on routine patrol in a high drug area saw two men "standing on the corner," and saw the defendant openly "give [the other man] a pack of cigarettes."  181 N.J. at 18.  The Court emphasized repeatedly that "[t]he activity observed by [the officer] was the passing of a cigarette pack."  Id. at 29.  Although the officer, whose experience was not detailed, was "aware

13

that a cigarette pack sometimes is used to transport drugs," the Court stressed that:

> there was no proof of "regularized police experience that objects such as [hard cigarette packs] are the probable containers of drugs." The sum of the evidence was merely the officer's prior general narcotics training and experience, and his conclusory testimony that he knew that cigarette packs are used to transport drugs because he had seen that type of activity before. The evidence did not even include the number of times the officer had encountered the use of cigarette packs to exchange drugs or what percentage of observed cigarette packs held drugs.
>
> [Id. at 28 (quoting State v. Demeter, 124 N.J. 374, 385-86 (1991)).]

Here, as discussed, Sergeant Alston did not merely observe an individual casually exchanging a pack of cigarettes. Rather, he participated in a coordinated undercover operation that included incriminating conversations with McPartland and defendant that were further informed by his general experience and prior involvement with Canty.

Defendant also contends that the police made an improper Terry stop before arresting him. See Terry, 392 U.S. at 19. An investigatory detention or Terry stop occurs "when an objectively reasonable person feels that [their] right to move has been restricted." State v. Nishina, 175 N.J. 502, 510 (2003) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). A temporary Terry stop

14

is proper "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." Pineiro, 181 N.J. at 20 (quoting Nishina, 175 N.J. at 510). However, an investigative stop based on "a mere hunch" is invalid. State v. Coles, 218 N.J. 322, 343 (2014).

We disagree that there was an improper Terry stop. Detective Metz's vehicle was stopped not upon a reasonable suspicion but probable cause that defendant had committed crime. As the police had probable cause to arrest defendant, they clearly had a reasonable articulable suspicion to conduct a Terry stop. See State v. O'Neal, 190 N.J. 601, 611-12 (2007) ("The standard for a Terry stop 'is lower than the standard of probable cause necessary to justify an arrest.'" (quoting Nishina, 175 N.J. at 511)). In sum, we conclude that the court's decision to deny defendant's motion to suppress was supported by "sufficient credible evidence in the record" and the legal principles were appropriately applied. State v. Hinton, 216 N.J. 211, 228 (2013) (quoting State v. Handy, 206 N.J. 39, 44 (2011)); State v. Harris, 181 N.J. 391, 416 (2004).

## III.

In defendant's second point, he contends that the court should have imposed a "sentence of probation conditioned upon serving 364 days in the

A-5409-17T1

county jail with a requirement of successful completion of an in-patient drug rehabilitation program."[2] He asserts not that the court misapplied the aggregate and mitigating factors, but rather that his four-year sentence was excessive because it was inconsistent with "the goals set forth in [N.J.S.A. 2C:35-14]." He specifically maintains that had he "committed or been found guilty of a more serious crime where there was a presumption of incarceration or period of parole ineligibility, it would have been mandatory that he be sentenced to special probation."

We have considered these arguments and conclude they are sufficiently without "merit to warrant discussion in a written opinion." R. 2:11-3(e)(2). The sentence does not shock our conscience and was consistent with the standards detailed in the Code of Criminal Justice. See State v. Fuentes, 217 N.J. 57, 70 (2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] The State contends the sentencing argument is moot as defendant was paroled on November 14, 2019. We have nevertheless considered, and reject, defendant's arguments on the merits.

16

A-5409-17T1