**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2048-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JASHAWN SMITH,

      Defendant-Appellant.

_____

> Argued September 22, 2021 – Decided November 23, 2021
>
> Before Judges Fuentes, Gooden Brown, and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-07-0389.
>
> Morgan A. Birck, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Molly O'Donnell Meng, Assistant Public Defender, of counsel and on the brief).
>
> William P. Cooper-Daub, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; William P. Cooper-Daub, of counsel and on the brief).

PER CURIAM

After the trial court denied defendant's motions to suppress his statement to police detectives and evidence seized in an investigatory stop, defendant Jashawn Smith pleaded guilty to one count of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), was sentenced to a fifteen-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and ordered to pay restitution. Because the trial court did not err in denying the suppression motions or ordering restitution, we affirm.

I.

We glean the following facts from the record of the suppression hearings.

A.

On June 11, 2016, Trenton Police Detectives Crystal Everett and Jonathan Cincilla were patrolling in an unmarked white Crown Victoria sedan, well-known in the community as a police vehicle. At approximately 3:45 p.m., they received a dispatch advising police units a shooting was in progress at 5 Prospect Village, a neighborhood on the west side of Trenton. From the dispatch, the detectives understood three suspects were fleeing the area of the shooting. Recorded transmissions did not confirm the detectives' recollection about a broadcast concerning three suspects fleeing from Prospect Village, but not all

transmissions are recorded. A CAD[1] report indicated one dispatch contained information that "three . . . young males [had] jumped into a four-door white car and fled up Prospect Street towards Oak . . . ." Neither detective recalled hearing that information.

As members of the Street Crimes Unit, Everett and Cincilla were familiar with Trenton "hot spots," areas with high crime and recent shootings. They knew about an "ongoing feud between gang members of Prospect Village and gang members of North 25," which was a housing project located about a quarter mile from Prospect Village. After receiving the dispatch, Cincilla initially drove in the Prospect Village area, but, hearing other police units responding to Prospect Village, he drove towards North 25 to intercept any potential suspects returning to North 25 from the crime scene.

Approximately one minute after the radio dispatch, before the detectives reached North 25, Everett saw three men, who were later identified as defendant and his two co-defendants, on a sidewalk on Louise Lane running towards North 25 in the opposite direction of the location of the shooting. According to

---

[1] According to the Trenton Police Department's communications chief, the CAD or computer-aided dispatch system "aids the dispatcher and the call takers in logging in the assignments, the calls that come in, and also [in] maintaining the times for the officers when they respond to the assignments . . . ." Most of the calls and some of the dispatches are recorded.

A-2048-18

Everett, Louise Lane was "the quickest route between North 25 and Prospect Village." When Everett told Cincilla she had seen the three men, he turned the vehicle onto Louis Lane, driving slowly.

When defendant and his co-defendants saw the detectives, "they all immediately and instantaneously began walking as if to act natural." The detectives noticed the three men "were all sweating" and "breathing heavily." Cincilla recognized co-defendant Wilson George as someone he previously had seen at North 25 during prior investigations. Defendant had a "hoodie" in his hand and George was "carrying a black hooded sweatshirt at his waist" even though it was a sunny, ninety-degree day. George was "manipulating [the] . . . sweatshirt in his hands while holding it very low and he was kind of shifting it . . . left and right . . . as if he was attempting to discard something." Everett saw George drop "the sweatshirt right next to the parked car" and then walk away from the car without the sweatshirt. Cincilla also saw George "shaking" the sweatshirt against the car.

The detectives stopped and exited their vehicle. Everett believed the three men were "potential suspects in the shooting" because of the known feud between the North 25 and Prospect Village gangs and her observations of them, including the direction in which they were running, that they stopped running

4

when they saw the detectives, their clothing, and George's apparent effort to drop something. Out of safety concerns and "to possibly detain them," Everett, with her handgun drawn, ordered the three men to get on the ground. Co-defendants complied immediately; defendant ran. Cincilla ran after him for thirty to forty-five seconds. During the chase, Cincilla saw defendant drop his sweatshirt, revealing he was holding a handgun. Cincilla told defendant to stop; defendant continued to run. Police officer Pedro Nieves pulled his patrol car alongside defendant and ordered him to stop running.

Eventually, defendant stopped and dropped the handgun. Cincilla brought defendant to the ground to distance him from the handgun and to gain control of him. While Cincilla and defendant were on the ground, they engaged in a brief struggle as defendant attempted to crawl away. Cincilla hit defendant "a couple of times to get him to stop" resisting and to prevent defendant from "get[ting] to the gun." Nieves took control of defendant, while Cincilla recovered the nine-millimeter, semi-automatic handgun defendant had dropped. Officer Nieves transported defendant to headquarters.

### B.

Mercer County Prosecutor's homicide task force detectives Ryan Woodhead and Patrick Holt interrogated defendant in the early morning hours

5

of the next day. Holt began the video-recorded interrogation by telling defendant, "[w]e're going to talk to you about a couple of things," but first they would "advise [him] appropriately what [his] charges [were]." Defendant was provided with a Mercer County Uniform Complaint Arrest Warrant Notification form. Holt confirmed defendant had a copy of his charges and told him, "I need to explain them to you verbatim and then have you sign off on this form." Holt advised defendant "a criminal complaint arrest warrant has been issued for you . . . for the following charges. . . . [C]harge one is unlawful possession of a weapon, handgun, obstruction of administrative [sic] law [2]. . . resisting arrest with eluding and . . . another resisting arrest charge." Holt asked defendant to sign the form if he understood "these four charges." Defendant signed the form.

Holt said to defendant, "[o]bviously you've been charged with these four charges . . . I want to discuss this and some other things with you but before we can talk to you I've got to advise you of your Miranda rights." Holt read defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966); defendant acknowledged understanding his rights, stated his willingness to talk to the detectives, and signed the Miranda waiver form. According to Woodhead,

---

[2] We infer the detective meant the obstruction of the administration of law, as defined in N.J.S.A. 2C:29-1(a).

defendant, who was eighteen-years old, appeared to understand his rights, answering in the affirmative and nodding his head; he seemed relaxed and alert, and did not manifest any signs of being under the influence of any narcotics or other inebriating substances. In the course of the interrogation, Holt asked defendant if he knew "somebody was murdered tonight . . . a [fifteen] year old . . . got killed in Prospect Village." When asked why that information was not provided to defendant earlier in the interrogation, Woodhead answered, "there was no secret that we were going to talk to him about a homicide that happened."

Defendant ultimately admitted he and his co-defendants went to Prospect Village because they wanted "payback" for a friend who had been killed. Defendant stated he fired his gun three times at a crowd of people he believed were responsible for his friend's death.

According to Woodhead, sometime after an interrogation of a suspect, the result of the interrogation is given to the assistant prosecutor assigned to the case. Based on the assistant prosecutor's recommendation, a determination is made about whether to issue additional charges. On December 6, 2016, defendant was charged with murder.

A-2048-18

C.

A grand jury indicted defendant and his co-defendants jointly on first-degree murder, N.J.S.A. 2C:11-3(a)(2) and 2C:2-6, and other second-degree weapons-related offenses and defendant individually for second-degree unlawful possession of handgun, N.J.S.A. 2C:39-5(b), and fourth-degree obstructing the administration of law or other government function, N.J.S.A. 2C:29-1(a).

Defendant moved to suppress "all evidence illegally obtained pursuant and subsequent to a warrantless seizure by Trenton Police officers on June 11, 2016." Co-defendant Juprie E. Wadley similarly moved to suppress. Co-defendant George joined in their motions. After a two-day evidentiary hearing, Judge Robert C. Billmeier denied the motions in a twenty-three-page written opinion. Finding the detectives credible, Judge Billmeier held their decision to stop defendant was based on "reasonable articulable suspicion," defendant's flight created "an individual basis for seizure of the handgun recovered from him," and the plain-view doctrine supported the seizure of the handgun.

Defendant moved to suppress his statement to Detectives Woodhead and Holt, arguing, among other things, he was "very visibly exhausted" and his waiver of rights was not fully informed because the detectives had not identified

themselves as members of a homicide unit and had not initially told him he was a suspect in a murder investigation. After viewing the video recording of the statement and hearing testimony from Woodhead, whom he found to be a "credible and truthful witness," Judge Billmeier denied the motion. He found defendant to be "an intelligent young man" who was "tired" but alert during the interrogation. Citing State v. Nyhammer, 197 N.J. 383 (2009), Judge Billmeier held the detectives properly had advised defendant of the four charges that had been filed against him at that time and were not required to inform defendant he was a murder suspect. The judge noted at the time of the interrogation "the police had to do a lot more investigation beyond what they found at the crime scene of Prospect Village," including witness interviews and obtaining video-surveillance tapes, before they could charge defendant with murder. The motion judge concluded defendant had made "an intelligent, voluntary waiver" of his Miranda rights "under the totality of the circumstances."

On June 25, 2018, pursuant to a negotiated plea agreement, defendant pleaded guilty to one count of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). In the plea form he executed, defendant acknowledged he was aware he "must pay restitution if the court finds there is a victim who has

suffered a loss and if the court finds that you are able or will be able in the future to pay restitution."

Defendant and his co-defendants were sentenced pursuant to their respective plea agreements during a joint hearing they and their counsel attended on August 31, 2018. During the sentencing hearing, the State requested the court order defendant, jointly and severally with his co-defendants who also had entered into a plea agreement with the State, to pay restitution of $5,000 to the Victims of Crimes Compensation Office (VCCO) and $2,355 to the victim's mother for funeral expenses. Regarding the victim's mother's restitution, defense counsel asked for "documentation so [he had] something to demonstrate what exactly was spent and then [defendant] can concede to that." Judge Billmeier stated, "when I prepare the [Judgment of Conviction] . . . I'll impose the $5,000 [VCCO restitution] subject to the addition of $2,355" in restitution for the victim's mother and told defense counsel to "advise the [c]ourt whether [defendant] require[s] a hearing" after having had an opportunity to review the supporting documentation provided by the State. Defense counsel agreed to that procedure, responding, "exactly."

The judge issued the initial Judgment of Conviction. On September 4, 2018, the assistant prosecutor sent an email to court staff, defendant's counsel

and co-defendants' counsel, indicating the State had understood the judge would not issue judgments until after the parties resolved the restitution issue. The judge's assistant responded, "[i]f the defendants agree to the additional restitution the court will amend the [Judgments of Conviction] accordingly. If the defendants do not agree to the additional amounts, the [j]udge will conduct a restitution hearing." Six days later, the assistant prosecutor sent to the court, defendant's counsel, and co-defendants' counsel an email attaching receipts for the funeral and burial costs incurred by the victim's mother, totaling $2,415, and asking the judge to amend the judgments to include that amount in restitution to the victim's mother. The judge's assistant sent an email, asking "if the defendants agree to the additional restitution request." Defendant's and co-defendants' counsel agreed to the restitution amount. Defendant's counsel expressly stated, "[o]n behalf of Jashawn Smith, I agree to that restitution amount." With all defense counsel stating their clients' agreement to the restitution amount and none of them requesting the restitution hearing the judge had offered, the judge did not conduct a restitution hearing and issued revised judgments including the agreed-on restitution.

In this appeal, defendant argues:

POINT I

THE TRIAL COURT ERRED IN FINDING THAT POLICE LAWFULLY STOPPED DEFENDANT WHERE THERE WAS NO SUSPICION THAT HE WAS ENGAGED IN CRIMINAL ACTIVITY. BECAUSE THE EVIDENCE SEIZED WAS TAINTED BY THE UNLAWFUL STOP, DEFENDANT'S MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED.

    a. The Stop Was Unlawful Because the Officers Had No Reasonable Suspicion That Smith Was Engaged in Illegal Activity.

    b. Smith's Flight Did Not Provide an Additional Justification for the Seizure of the Gun.

POINT II

DEFENDANT'S WAIVER OF HIS MIRANDA RIGHTS WAS NOT KNOWING AND VOLUNTARY BECAUSE HE WAS NOT TOLD THAT HE WAS BEING INTERROGATED AS THE SUSPECT IN A HOMICIDE.

POINT III

THE MATTER MUST BE REMANDED FOR A HEARING ON DEFENDANT'S ABILITY TO PAY THE RESTITUTION IMPOSED.

II.

Our scope of review of a suppression decision is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We uphold a trial court's factual findings made in

connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses . . . ." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020). "[A] trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court," State v. S.S., 229 N.J. 360, 374 (2017), but only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). We review de novo a trial court's legal conclusions. Ahmad, 246 N.J. at 609.

## A.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218, 231 (2018). A warrantless search or seizure is presumptively unreasonable and invalid. State v. Chisum, 236 N.J. 530, 545 (2019); State v. Hagans, 233 N.J. 30, 38 (2018). For a court to find permissible a warrantless search or seizure,

the State must prove the search or seizure fell within one of the few recognized exceptions to the warrant requirement. Chisum, 236 N.J. at 545. An "investigatory stop of a person" is one of those exceptions. Ibid.

A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" State v. Rosario, 229 N.J. 263, 272 (2017) (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). An investigative stop is permissible "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." State v. Pineiro, 181 N.J. 13, 20 (2004) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)). It is not permissible if it is based on "arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014).

Reasonable suspicion is an objective, fact-sensitive inquiry. Pineiro, 181 N.J. at 22; see also State v. Dunbar, 434 N.J. Super. 522, 526 (App. Div. 2014). A court must determine "whether at the moment of seizure, the officer had at his

[or her] command sufficient facts supporting a person of reasonable caution in the belief that seizure was appropriate." Dunbar, 434 N.J. Super. at 526. "[I]n evaluating whether an officer had a reasonable suspicion to conduct a brief investigatory stop," a court must consider "[t]he totality of the circumstances," including the "officer's experience and knowledge." Pineiro, 181 N.J. at 22.

The plain-view exception is another recognized exception to the warrant requirement. State v. Williams, 461 N.J. Super. 1, 10 (App. Div. 2019). The plain-view exception "authorizes a police officer to seize evidence or contraband that is in plain view." State v. Gonzales, 227 N.J. 77, 90 (2016). Under the plain-view exception, the "officer must lawfully be in the area where he observed and seized the incriminating item or contraband, and it must be immediately apparent that the seized item is evidence of a crime." Id. at 101.

Defendant argues the police had "no reason" to believe he was "one of the shooters." We disagree. As Judge Billmeier found, based on the totality of circumstances, the detectives had enough information to form a "reasonable articulable suspicion" that defendant had been engaged in criminal activity justifying the investigative stop. Everett and Cincilla knew not only that Prospect Village and North 25 were high-crime areas but also that gangs from those neighborhoods were engaged in an on-going feud. Their decision to look

15

for suspects in North 25 was more than a hunch; it was based on their knowledge and experience.

Defendant asserts the detectives "did not have any description of the suspects at all." To the contrary, the detectives credibly testified they had heard three suspects were fleeing the scene of the shooting in Prospect Village; they saw defendant as one of three men running from the direction of Prospect Village toward North 25 on the quickest route between those neighborhoods. The three men were sweating and "breathing heavily." Cincilla recognized co-defendant George and knew from prior investigations he was from North 25. Cincilla and Everett saw the three men "immediately and instantaneously" begin to walk "as if to act naturally" after seeing the detectives. They noticed defendant and co-defendant George carrying sweatshirts, which was suspicious under the circumstances on that ninety-degree, sunny day. They observed George shaking his sweatshirt behind a car as if he were attempting to discard something and then leave the sweatshirt behind the car. That information collectively was sufficient to enable the detectives to form a reasonable and particularized suspicion of criminal activity.

And we know there was more. When Everett directed the three men to get on the ground, defendant ran. Unlike the defendant in State v. Tucker, 136

16

N.J. 158, 161 (1994), on which defendant relies, defendant wasn't just sitting on a curb when he started running.  See also State v. Williams 192 N.J. 1, 11 (2007) (holding "a person has no constitutional right to flee from an investigatory stop, 'even though a judge may later determine the stop was unsupported by reasonable and articulable suspicion'") (quoting State v. Crawley, 187 N.J. 440, 458 (2006)).  As he was chasing him, Cincilla saw defendant discard his sweatshirt, revealing he was holding in plain view a handgun, which he dropped when he ultimately stopped running.  As Judge Billmeier found, the seizure of the handgun was also supported by defendant's flight and the plain-view exception.

Defendant urges us to make different credibility or factual determinations than the motion judge made.  We see no basis to do so.  Defendant also would have us focus on the facts, each of which he says lacks reason for suspicion, individually.  While we reject defendant's innocent portrayal of the individual facts, we recognize "[e]ven if all of the factors were susceptible of purely innocent explanations, a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion."  Stovall, 170 N.J. at 368.  Looking at the facts in the aggregate as we must, Pineiro, 181 N.J. at 22, the detectives' knowledge and observations supported a finding of reasonable suspicion of

17

criminal activity such that the investigatory stop and resulting seizure of evidence were lawful. We affirm Judge Billmeier's denial of defendant's motion to suppress evidence obtained during the investigatory stop.

B.

The Fifth Amendment of the United States Constitution and New Jersey's common, statutory, and evidentiary law provide a right against self-incrimination. State v. A.M., 237 N.J. 384, 396 (2019); see also N.J.R.E 503; N.J.S.A. 2A:84A-19 ("every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate"). In Miranda, 384 U.S. at 467, the United States Supreme Court developed certain safeguards to ensure a person subject to police interrogation understands the right against self-incrimination and has a "meaningful opportunity" to exercise it. Nyhammer, 197 N.J. at 400. Pursuant to those Miranda safeguards, an individual in custody must be warned prior to any questioning he has the right to remain silent, anything he says can be used against him in a court of law, he has the right to the presence of an attorney, and if he cannot afford an attorney, one will be appointed for him prior to any questioning if he wants an attorney. Miranda, 384 U.S. at 479.

A person can waive those rights, ibid., but the waiver must be "knowing, intelligent, and voluntary in light of all the circumstances" and, under New Jersey law, the prosecutor must prove those characteristics beyond a reasonable doubt. State v Presha, 163 N.J. 304, 313 (2000); see also State v. Tillery, 238 N.J. 293, 315 (2019). To determine "whether the waiver of rights was the product of a free will or police coercion," a court considers "the totality of the circumstances." Nyhammer, 197 N.J. at 402; see also State v. Puryear, 441 N.J. Super. 280, 292 (App. Div. 2015). Factors under that test include: "suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." State v. Galloway, 133 N.J. 631, 654 (1993); see also State v. Hreha, 217 N.J. 368, 383 (2014).

A suspect is unable to provide a knowing and voluntary waiver of his rights if he is not provided the "indispensable" information that a criminal complaint or arrest warrant has been filed against him. State v. A.G.D., 178 N.J. 56, 68 (2003); see also State v. Vincenty, 237 N.J. 122, 134 (2019). The Supreme Court in A.G.D., "impos[ed] the basic requirement [of] inform[ing] an interrogatee that a criminal complaint or arrest warrant has been filed or issued."

19

A.G.D., 178 N.J. at 68-69.  In imposing that requirement, the Court did not intend to "unduly burden[] existing police practices."  Id. at 69.  In Nyhammer, the Court declined to impose a requirement that an interrogatee be informed of his status as a suspect.  Distinguishing A.G.D., the Court described the "issuance of a criminal complaint and arrest warrant" as "an objectively verifiable and distinctive step" whereas "suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers.  A suspect to one police officer may be a person of interest to another officer."  Nyhammer, 197 N.J. at 404-05.  Rejecting disclosure of suspect status as a bright-line test in determining whether a waiver of rights was knowing and voluntary, the Court in Nyhammer re-affirmed the application of the totality-of-the-circumstances test.  Id. at 405.

Like the defendant in Nyhammer, defendant asks us to impose a bright-line test and suppress his confession based on the detectives' purported failure to disclose "what the investigation was about."  Instead, following Nyhammer, we look at all of the circumstances surrounding his confession.  Applying that test, we agree with Judge Billmeier that defendant confessed after he knowingly, intelligently, and voluntarily waived his Miranda rights.  Detectives advised him of his rights and of every charge then made against him.  He was not yet charged

20

with murder because, as Judge Billmeier noted, "the police had to do a lot more investigation beyond what they found at the crime scene of Prospect Village on the afternoon of June 11, 2016." Moreover, defendant confessed after Holt had asked him if he knew "somebody was murdered tonight . . . a [fifteen] year old . . . got killed in Prospect Village." As Woodhead testified, "there was no secret that we were going to talk to him about a homicide that happened." We affirm Judge Billmeier's denial of defendant's motion to suppress his statement.

## C.

The purpose of restitution is to rehabilitate, not punish, the defendant and to compensate the victim. State v. DeAngelis, 329 N.J. Super. 178, 190 (App. Div. 2000); State in Interest of R.V., 280 N.J. Super. 118, 122 (App. Div. 1995). N.J.S.A. 2C:44-2(b) requires a court to sentence a defendant to pay restitution "if: (1) [t]he victim, or in the case of a homicide, the nearest relative of the victim, suffered a loss; and (2) [t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution." In determining the amount of restitution, a court must "take into account the financial resources of the defendant and the nature of the burden that its payment will impose." N.J.S.A. 2C:44-2(c)(1); see also State v. Williams, 467 N.J. Super. 1, 7 (App. Div. 2021).

21

"When a sentencing court has not conducted a meaningful evaluation of a defendant's ability to pay, appellate courts routinely vacate restitution orders and remand for reconsideration." RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 478 (2018). However, when there is "no dispute as to the amount ordered or defendant's ability to make restitution . . . [n]o restitution hearing is required . . . ." State v. Orji, 277 N.J. Super. 582, 589-90 (App. Div. 1994).

Here, defendant did not dispute the amount ordered or his ability to make restitution. When at the sentencing hearing the State requested restitution of $5,000 to VCCO and $2,355 to the victim's mother, defense counsel asked for documentation regarding the mother's expense. The judge outlined the procedure they would follow: defendants would review the requested documentation and advise the court whether they needed a restitution hearing. Defense counsel on the record in defendant's presence agreed to that procedure. The judge's assistant confirmed in an email the judge would conduct a restitution hearing if defendants did not agree to the requested restitution amount. After defendant's counsel had an opportunity to review the State's documentation, instead of asking to have the restitution hearing offered by the judge, he advised the court in an email, "[o]n behalf of Jashawn Smith, I agree to that restitution amount." Having agreed to the procedure outlined by the court and to the

restitution requested by the State, defendant is bound by it. We see no error in the restitution award or the procedure followed by the court and the parties.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2048-18